**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA,  . CRIMINAL NO. 1:15-cr-10271-WGY-1
    Plaintiff       .
                   . BOSTON, MASSACHUSETTS
        v.         . AUGUST 17, 2015
                   .
ALEX LEVIN,           .
    Defendant     .
. . . . . . . . . . . . .

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:  UNITED STATES ATTORNEY'S OFFICE
                      BY: David G. Tobin, AUSA
                      One Courthouse Way
                      Suite 9200
                      Boston, MA 02210
                      617-748-3965
                      david.tobin@usdoj.gov

For the Defendant:   Joshua Robert Hanye, Esq.
                      Federal Public Defender's Office
                      5th Floor
                      51 Sleeper Street
                      Boston, MA  02210
                      617-223-8061
                      joshua_hanye@fd.org

Court Reporter:

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

1                              **I N D E X**

2  **WITNESSES**                **DIRECT**   **CROSS**    **REDIRECT**    **RECROSS**

3  **Government's:**

4  DET. MICHAEL SULLIVAN       4        8              21           27

5  **ARGUMENT:**   Mr. Tobin ................................   27

6  **RESPONSE:**   Mr. Hanye ................................   32

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  COURT CALLED INTO SESSION

2  (3:18:43 P.M.)

3           THE CLERK:  The United States District Court for

4  the District of Massachusetts is now in session, the

5  Honorable Marianne B. Bowler presiding.  Today is Monday,

6  August 17, 2015.  The case of U.S. v. Levin, Magistrate

7  Judge No. 15-2192, will now be heard.

8           Will counsel please identify themselves for the

9  record.

10          MR. TOBIN:  Good afternoon, Your Honor.  David

11 Tobin on behalf of the United States.

12          THE COURT:  Thank you.

13          MR. HANYE:  Josh Hanye for Mr. Levin.  Good

14 afternoon, Your Honor.

15          THE COURT:  Good afternoon.

16          Well, this is on for detention and probable cause.

17          There was some issue regarding appointment of

18 counsel, and I just wanted to state for the record that I

19 have reviewed the financial affidavit submitted by the

20 defendant, and I do have some question on the eligibility

21 for appointment of counsel.

22          And Mr. Hanye, I'll appoint you provisionally now;

23 however, I will make a note that the defendant's financial

24 status should be reviewed at the termination of the case.

25          MR. HANYE:  Understood.  Thank you.

4

1          THE COURT:  He may have to reimburse the

2 government for representation.  Are you ready to proceed?

3          MR. TOBIN:  I am, Your Honor.

4          Your Honor, the United States has one witness, and

5 with the Court's permission I'll call him now, and that's

6 task force officer Michael Sullivan.

7          THE COURT:  Would you please come forward and be

8 sworn?

9      GOVERNMENT WITNESS, DETECTIVE MICHAEL SULLIVAN, SWORN

10          THE CLERK:  Please introduce yourself spelling

11 your name for the record.

12          THE WITNESS:  My name is Michael Sullivan.  My

13 first name is spelled M-I-C-H-A-E-L.  My last name is

14 spelled S-U-L-L-I-V-A-N.

15                    DIRECT EXAMINATION

16 BY MR. TOBIN:

17 Q.   Good afternoon, sir.

18 A.   Good afternoon.

19 Q.   Would you please tell the Court how you are employed?

20 A.   I'm employed as a detective with the City of Boston

21 Police Department.

22 Q.   How long have you served as a police officer in the

23 City of Boston?

24 A.   For about nine and a half years.

25 Q.   For how long have you held the rank of detective?

5

1  A.    Almost three years.

2  Q.    And to which unit of the Boston Police are you current

3  assigned?

4  A.    The Crimes Against Children Unit.

5  Q.    Are you also involved with the task force working in

6  conjunction with the Federal Bureau of Investigation?

7  A.    Yes.

8  Q.    And how long have you been part of that task force?

9  A.    Just over a year, I believe.

10  Q.    And what is the purpose of the task force?

11  A.    The task force investigates the exploitation of

12  children.

13  Q.    And what are your primary duties and responsibilities

14  as the task force officer in this FBI task force?  What do

15  you do?

16  A.    My focus is the online exploitation of children, child

17  pornography investigations, other Internet investigations

18  involving the exploitation of children.

19  Q.    Sir, did you participate in the investigation which

20  ultimately culminated in the arrest of this defendant?

21  A.    Yes, I did.

22  Q.    And what role did you play in that investigation?

23  A.    I was the lead agent and the lead investigating officer

24  on that case.

25  Q.    And can you tell us who the defendant, in fact, is?

1  A.   Alex Levin.

2  Q.   You were present for his arrest?

3  A.   I was.

4  Q.   You were present for the search of his residence in

5  Norwood, Massachusetts?

6  A.   Yes.

7  Q.   And as part of your role as the lead case agent in this

8  investigation, did you submit an affidavit to this Court in

9  support of a criminal complaint?

10  A.   Yes.

11  Q.   And you swore to that?

12  A.   Yes.

13  Q.   And that contained information that you new firsthand

14  or had learned from other officers involved in the case?

15  A.   Yes.

16       MR. TOBIN:  Your Honor, may I approach the

17  witness, please?

18       THE COURT:  You may, and you need not ask again.

19       MR. TOBIN:  Thank you.

20  Q.   I'm going to hand you a document.  Can you look at it,

21  and once you've had an opportunity to do so, please look up.

22       What is that primarily?

23  A.   This is my affidavit for a criminal complaint.

24  Q.   And your signature is actually on the front page of the

25  criminal complaint form itself and then on the last page of

1  the affidavit; is that accurate?

2  A.   Yes.

3        MR. TOBIN:  Your Honor, I won't ask that this be

4  moved into evidence, because I believe the Court has

5  actually the original, and it's all part of the record to

6  these proceedings.

7        THE COURT:  So noted.

8  Q.   And I see that this was signed by you on August 12,

9  2015; is that correct?

10  A.   Yes.

11  Q.   It wasn't that long ago, but is there anything in the

12  affidavit that needs to be changed or modified or corrected

13  if you had the opportunity to learn anything that runs

14  contrary to what's in the affidavit?

15  A.   No, I have not.

16  Q.   So you believe that the information in the affidavit

17  remains as true today as it was on the 15th when you first

18  signed it?

19  A.   12th I believe it was.

20        THE COURT:  The 12th.

21  Q.   The 12th.  I'm sorry.

22  A.   Yes.

23  Q.   I'm sorry.  The 15th is the -- '15 is the year.

24     Thank you.  I don't have any further questions at this

25  time, but please remain seated.

8

1          THE COURT:  Cross-examination, Mr. Hanye?

2          MR. HANYE:  Thank you.

3          THE COURT:  You're welcome.

4                    CROSS-EXAMINATION

5  BY MR. HANYE:

6  Q.    Good afternoon, Detective.

7  A.    Good afternoon, sir.

8  Q.    You're aware that as part of this investigation

9  electronic devices were seized from Mr. Levin's home?

10  A.    Yes.

11  Q.    And can you tell us what they were?

12  A.    I can tell you in broad terms.  I believe it was two

13  laptops, his phone, some external hard drives, a thumb drive

14  or multiple thumb drives.

15  Q.    And what happened with all those devices after they

16  were seized at his arrest?

17  A.    They've been held by the FBI, and they will undergo

18  further examination.

19  Q.    Have they undergone any further examination to your

20  knowledge at this point?

21  A.    There's currently an examination ongoing right now on

22  one of the devices.

23  Q.    Are you aware of the results of that examination?

24  A.    I do not.

25  Q.    I believe in the complaint affidavit you mentioned that

1 there were seven videos and one image that you considered to

2 be child pornography that was found on one of the laptops;

3 is that right?

4 A.   That's correct, sir.

5 Q.   Are you aware of whether any other images of child

6 pornography have been found?

7 A.   No, sir.

8 Q.   Were you the one who saw the videos and the still image

9 on the laptop that was seized?

10 A.   They provided me a CD from the laptop, like a preview

11 CD, and I viewed those items on a CD produced by the

12 forensic computer people.

13 Q.   So you saw them yourself, but not necessarily like on

14 the laptop directly?

15 A.   That's correct.

16 Q.   Do you have any information about how or when those

17 images were placed onto the laptop?

18 A.   I don't have anything definitive yet.  No, sir.

19 Q.   Well, you say definitive.  What information do you

20 have?

21 A.   I can see a creation date.

22 Q.   What was the --

23 A.   I believe it was October, 2011.

24 Q.   And was that for one of the files? for multiple files

25 at the same creation date?

1  A.   I believe all of them were around that same date.  I'm

2  not absolutely certain.

3  Q.   So nearly four years old?

4  A.   That's correct, sir.

5  Q.   Were you able to see --

6       So other than the creation date, were you able to tell

7  any other information about how they were placed there?

8  A.   No, sir.

9  Q.   Or by whom?

10 A.   No, sir.

11 Q.   What about where on the laptop they were located?  So

12 describe the folder or file in which they were found.

13 A.   I know part of the pathway of the file included the

14 name "Alex."  I cannot tell you the whole pathway, but I

15 know a part of the file name had Alex in it.

16 Q.   Okay.  Anything else you could see about that?

17 A.   No, sir.

18 Q.   That part of the pathway, how many potential different

19 locations could that lead to, could a pathway lead to?

20 A.   I don't know.

21 Q.   Lots; fair to say?

22 A.   I would say so.

23 Q.   The creation date was in October of 2011.

24      Was there any information about whether they had been

25 viewed anytime since then?

1  A.   I believe one of the files was viewed in January, 2015.

2  Q.   And how would you have learned that?

3  A.   Because there's a section on the properties I believe

4  it is, and it says "last viewed," and there was a date.

5  Q.   And is that what you remember as being the most recent

6  viewing of any of the images that you looked at?

7  A.   That's correct.

8  Q.   Now, you're aware that the investigation into Mr. Levin

9  was based on an IP address that was obtained through the use

10 of something called a Network Investigative Technique; is

11 that right?

12 A.   That's correct.

13 Q.   That's referred to as NIT?

14 A.   It is.

15 Q.   And the Network Investigative Technique, the NIT, is

16 designed to try to trace a user to a specific IP address

17 that's otherwise hidden; is that right?

18 A.   That's correct.

19 Q.   And in this case that occurred on February 23rd of

20 2015?

21 A.   That sounds accurate.

22 Q.   Did you write an affidavit for a search warrant in this

23 case?

24 A.   I did.

25 Q.   Would it help you confirm that date if you were to take

1 a look at that?

2 A.   It would, sir.

3       MR. HANYE:  And may I approach, Your Honor?

4       THE COURT:  You may, and you need not ask again.

5 Q.   I'm referring you to paragraph 27.

6    What you're looking at, is that the search warrant

7 affidavit that you typed up?

8 A.   It is, sir.

9 Q.   Paragraph 27, the IP address that was identified

10 through the NIT was on February 23rd of 2015?

11 A.   That's correct, sir.

12 Q.   Now, this was all stemming from the government seizure

13 of a computer server facility in North Carolina in February

14 of 2015?

15       MR. TOBIN:  Your Honor, if I may, May we come to

16 the sidebar?

17       THE COURT:  Uh-huh.

18    (Discussion at sidebar on the record.)

19       MR. TOBIN:  I'm just concerned about the inquiry

20 into the subject matter having filed today under seal the

21 motion to disclose the search warrant affidavit to the

22 defense, and we took the unusual step of asking for us to

23 disclose a sealed document in the aspect of search warrant

24 affidavit not be unsealed, which is typical, and we did that

25 because this is part of a very large national investigation

1 with potentially many, many, many defendants, and the

2 authorities who are coordinating this are terribly nervous

3 at information about the infiltration of this (inaudible).

4        If it is made public, their efforts to round up

5 these lurid child pornographers or people with child

6 pornography will be thwarted, because these things will go

7 out (inaudible) very quickly.  So I'm just merely asking

8 that either one --

9        THE COURT:  (Inaudible)?

10       MR. HANYE:  I would like to establish that it was

11 one time that it was accessed, so the search warrant

12 affidavit only talks about traces to that IP address one

13 time.

14       There's a couple of other through the Network

15 Investigative Technique.  They say that the user (inaudible)

16 accessed it, you know, approximately two hours total

17 (inaudible).  And we just need the website's name.

18       MR. TOBIN:  I don't think we even know the

19 website.  I think we actually -- even out of the affidavit

20 --

21       MR. HANYE:  It is out of the affidavit.

22       MR. TOBIN:  I'm sure my brother's not going to try

23 to make this all public.  I'm just asking him and asking the

24 Court to ensure that we can have a very quick circumspect --

25       MR. HANYE:  Thank you.

1    (End of discussion at sidebar.)

2   BY MR. HANYE:

3   Q.   So the Network Investigative Technique was a way to try

4   and find otherwise hidden IP addresses; is that right?

5   A.   That's right.

6   Q.   And an IP address is a distinctive number that can

7   identify a particular device that accesses the Internet; is

8   that correct?

9   A.   More like an origin on the Internet.  Not really a

10  device, but origin I would say.

11  Q.   So what do you mean by "origin"?

12  A.   Because multiple devices can share the same IP address.

13  Q.   Okay.

14  A.   So it goes back to a point.

15  Q.   And then when you have an IP address, you can then use

16  that to find out who that's registered to; is that correct?

17  A.   Typically we can.

18  Q.   And in this case there was an IP address that was found

19  throughout the Network Investigative Technique that you then

20  later identified as being registered to Alex Levin; is that

21  correct?

22  A.   That's correct.

23  Q.   And that was based on the employment of the Network

24  Investigative Technique on one occasion.  That was February

25  23rd of 2015?

1 A.    That's correct.

2 Q.    There were no other occasions where the Network

3 Investigative Technique identified that IP address as

4 accessing the website in question?

5 A.    Not that I know of, no, sir.

6 Q.    And just in general, the NIT is designed to send out

7 information when a user accesses a particular website; is

8 that right?

9 A.    Probably over my forensic abilities how it actually

10 works.

11 Q.    Could you describe to the best of your knowledge how it

12 works?

13         MR. TOBIN:  Your Honor, I would suggest that that

14 question probably is just not necessary for the purposes of

15 detention, so I would object.

16         THE COURT:  Sustained.

17 Q.    You don't have any information about the IP address

18 that you believe is associated with Mr. Levin.  You don't

19 have any information about that IP address posting any

20 images to the website.

21 A.    That's correct we have no information to that effect.

22 Q.    Were there any hard materials containing child

23 pornography found at Mr. Levin's residence?  Magazines,

24 papers, anything like that?

25 A.    No, sir.

1  Q.    No printouts of photos?

2  A.    No, sir.

3  Q.    In your search warrant affidavit you refer to -- the

4  investigation was based on a user name, Monakaralupa

5  (phonetic).  Does that sound right?

6  A.    That sounds correct, sir.

7  Q.    And that was the user name that the NIT used to trace

8  to a specific IP address?

9  A.    The IP address associated with that user name, that's

10 correct.

11 Q.    On that one occasion?

12 A.    Correct.

13 Q.    And you referred to Monakaralupa (phonetic) being

14 registered on the website as a "normal member"?

15 A.    Correct.

16 Q.    Do you recall using that?

17 A.    I do.

18 Q.    What does "normal member" mean?

19 A.    The lead that came to us, how the page came to us.

20 It's one of the areas that must have captured, and it just

21 listed user type normal.  How that website categorizes

22 users, I don't know.

23 Q.    Do you know what the other types of members are?

24 A.    That's the only type I've seen.

25 Q.    This NIT technique can only be used when the government

1  has actually seized servers; is that correct?

2        MR. TOBIN:  Again, objection as to the issue --

3        THE COURT:  Sustained.

4  Q.   The theory that Mr. Levin accessed the website is based

5  entirely whether the NIT actually does what it purports to

6  do; isn't that correct?

7  A.   NIT captures the IP address to log onto the website.

8  It doesn't identify Mr. Levin as the person that logged on

9  the website; it identifies an IP address that logs onto

10 website.  An origin --

11 Q.   Let me try to ask a better question.

12 A.   Okay.

13 Q.   This website was in an area of the Internet that's not

14 accessible to normal users; isn't that correct?

15 A.   If you know what you're doing, you can get to that area

16 of the Internet.

17      So for an average user, they probably would not know

18 how to get there.  They'd have to have some type of

19 knowledge how to get to that part of the Internet.

20 Q.   What do you have to know?

21      When you say you know what you're doing, what do you

22 have to know to be able to access this area of the Internet?

23 A.   You have to use a certain browser to get there.

24 Q.   How do you get the browser?

25 A.   You can download the browser.

1 Q. Does this area of the Internet have a colloquial name?

2 A. The browser?

3 Q. No. The area of the Internet that we're talking about.

4 Is it called the Deep Web? Is that --

5 A. I think there's various -- what things are called.

6 Q. What have you heard it referred to as?

7 A. I associate it with more as a TOR website.

8 Q. Okay. What does TOR stand for?

9 A. TOR is anonymous -- the browser anonymizer that

10 accesses the website.

11 Q. That's the name of the browser?

12 A. Correct.

13 Q. Does it stand for The Onion Road?

14 A. I don't know what it stands for. It's TOR, T-O-R.

15 Q. Have you heard of The Onion Road?

16 A. I have.

17 Q. Do you understand that to be a browser?

18 A. No. I understand TOR to be a browser.

19 Q. Okay.

20 A. That's an acronym.

21 Q. You used the word anonomize.

22 How does this browser that we're discussing anonomize

23 its users?

24 A. To the best of my understanding, it goes through

25 several different IPs to get to the destination part.

1  Q.   So it routes the communication through a bunch of

2  different IP addresses so you can't tell who the original

3  user is; is that correct?

4  A.   That's correct.

5  Q.   And that normally you could only trace the

6  communication back to the most recent IP address which

7  wouldn't tell you where it originated?

8  A.   That's correct.

9  Q.   And that's where this new NIT technique comes in; is

10  that correct?

11  A.   As I understand it, yes.

12  Q.   And you can't explain exactly how the NIT technique

13  works?

14  A.   I cannot.

15  Q.   Are you familiar with the term "slaving a computer"?

16  A.   I am not.

17  Q.   How about malware?

18  A.   Yes.

19  Q.   What is malware?

20  A.   It's malicious software to download to your computer.

21  Q.   And what could that software be used for?

22  A.   Probably anything.

23  Q.   So you're aware that one computer can take over --

24  excuse me.

25       One computer can have remote access to another computer

1 through the use of malware; is that fair to say?

2 A.   I believe it could.

3 Q.   What about the term Bot?  Have you heard that term?

4 A.   Say it again.

5 Q.   Bot.  Like robot.  Bot.

6 A.   No idea.

7 Q.   What about Trojan horse software?

8 A.   I'm familiar with Trojan HORSE.

9 Q.   Okay.  So Trojan horse software generally refers to

10 accessing a computer but hiding an infected file that would

11 then allow a different user to access that computer later

12 on.

13 A.   Is that a question?  What's the question?

14 Q.   What's a Trojan horse?

15 A.   I just know it to be a virus.

16 Q.   Okay.  But a virus that allows another computer to

17 access one's own computer?

18 A.   I think your technology --

19    You're probably over my head at this point as far as

20 all these different things.

21 Q.   Have you heard the term hijacking a computer?

22 A.   Yes.

23 Q.   Are you aware that there's a way for a computer user to

24 take over control of another computer without the user of

25 the second computer knowing about it?

1  A.   I imagine there is.

2  Q.   Through things like malware or Trojan horse virus,

3  things like that?

4  A.   Okay.

5  Q.   Do you agree that that's generally --

6  A.   I believe that that's possible, sure.

7  Q.   You're aware that that manipulation is often done

8  through file sharing software that could be used, for

9  instance, sharing music files or movie files?

10 A.   I believe viruses are downloaded in a variety of ways

11 including file sharing software.

12 Q.   Is there anything about the investigation in this case

13 that could tell us that that's not what happened to Mr.

14 Levin's computer?

15 A.   At this point, no, there is not.

16         MR. HANYE:  I have no more questions.  Thank you.

17         THE COURT:  Any redirect?

18         MR. TOBIN:  I do, Your Honor.

19                 REDIRECT EXAMINATION

20 BY MR. TOBIN:

21 Q.   How many laptops did you find in the defendant's home?

22 A.   Two.

23 Q.   And how did he describe them in relation to each other?

24 A.   One's the "old one" and one is the "new one."

25 Q.   And were attempts made at his home to search both

1 computers?

2 A.    Yes.

3 Q.    And were those attempts successful?

4 A.    No.

5 Q.    Was it successful with one of the two computers?

6 A.    Yes.

7 Q.    Which computer were they able to get inside of and find

8 child pornography?

9 A.    The old laptop.

10 Q.    Now, when they tried to essentially forensically

11 examine the new computer, what happened?

12 A.    There were simply unable to get the hard drive out of

13 the laptop.

14 Q.    And that is being done now?

15 A.    That's being requested through the process to get done.

16 That's correct.

17 Q.    You mentioned other media that were there such as thumb

18 drives and things of that nature.

19 A.    Yes, sir.

20 Q.    Were those examined?

21 A.    They were.

22 Q.    And were you able to get inside of those?

23 A.    Not all, no.

24 Q.    Why not?

25 A.    Some of them had encryption.

1 Q.   What is encryption software?

2 A.   Encryption's basically a -- you need a password to get

3 into it.

4 Q.   Now, in some instances you folks are able --

5      When I say "you folks," I mean the forensic individuals

6 with whom you work.

7      On-site they can get into a computer, even computers

8 that sometimes need passwords; isn't that true?

9 A.   Sometimes, correct.

10 Q.  So it really has to do with the sophistication of the

11 encryption as to whether or not you can get in or can't get

12 in; is that true?

13 A.  True.

14 Q.  And it appeared as though there were some form of

15 encryption put on some of these medias that store things?

16 A.  That's correct.

17 Q.  So we know you found on the site in the old computer

18 this child pornography, some of which is detailed in the

19 criminal complaint affidavit; correct?

20 A.  Yes.

21 Q.  There may be more, but steps seemingly have been taken

22 to thwart efforts to get into some of those media storage

23 sites?

24 A.  Correct.  We're unable to get into some of the devices.

25 Q.  And some because you can't get it out of the machine,

1  at least you couldn't on-site, and some because there's

2  software prohibiting you from getting in?

3  A.   That's how I understand it; correct.

4  Q.   Now, his computer, --

5       When I say "his," I mean the defendant.

6       -- is it password protected?

7  A.   His new computer?

8  Q.   Well, you asked him if his computer was password

9  protected; didn't you?

10 A.   I did.

11 Q.   And what did he say?

12 A.   I believe he said yes.

13 Q.   Okay.  What does that mean?

14 A.   It means you need a password to get into his computer.

15 Q.   And you would need to know the password unless you were

16 a forensic expert or somebody like one of the forensic folks

17 you work with.

18      The casual user or visitor to the home wouldn't be able

19 to get in without a password; is that accurate?

20 A.   That's correct.

21 Q.   Does the defendant live with anyone else, or does he

22 live by himself?

23 A.   He lives by himself.

24 Q.   And I think you've explained having knowledge that the

25 forensic tools that were used even before the going to the

1 defendant's house indicated that a certain IP address was

2 accessing child pornography; is that true?

3 A.   The IP address was accessing a website that contained

4 child pornography.

5 Q.   And you were able to determine even then what sort of

6 things he -- at least in part what he was doing or that

7 person was doing on that website?

8 A.   We were able to observe what areas of that website he

9 went to and certain information about the computer he was

10 using.

11 Q.   I think you brought this out on cross-examination.

12     With the IP address in and of itself, that doesn't tell

13 you who was doing it.  You actually then had to what --

14     How did you get to who that IP address belonged to?

15 A.   An administrative subpoena was issued.

16 Q.   And that led you to which location?

17 A.   Mr. Levin's residence.

18 Q.   And it also led you to Mr. Levin, his own name; is that

19 true?

20 A.   That's true.

21 Q.   And my brother talked about all sorts of things about

22 high tech ways to hijack computers.

23     Did your forensic people who examined the computer thus

24 far mention anything to you about any evidence at all to

25 suggest that his computer had been attacked by Trojan horses

1 | or any other malware?

2 |     Has there been any evidence of that whatsoever at this

3 | point that you're aware of?

4 | A.  No.

5 | Q.  Okay.  Great.  Thank you.

6 |         MR. TOBIN:  I have no further questions.

7 |         THE COURT:  Cross on that limited area?

8 |         MR. HANYE:  Just to clarify.

9 |                 RECROSS-EXAMINATION

10 | BY MR. HANYE:

11 | Q.  The access from this particular IP address to the

12 | website in question was on that one day as determined by the

13 | NIT technicians?

14 | A.  That's how I understand it.

15 | Q.  And that was February 23rd of 2015?

16 | A.  Correct, sir.

17 |         MR. HANYE:  No more questions.

18 |         THE COURT:  All right.  You may step down,

19 | Detective Sullivan.

20 |         THE WITNESS:  Thank you, Your Honor.

21 |         THE COURT:  Further witnesses?

22 |         MR. TOBIN:  I do not, Your Honor.

23 |         THE COURT:  Witnesses for the defendant?

24 |         MR. HANYE:  None, Your Honor.

25 |         THE COURT:  All right.  I'll hear argument.

1       CLOSING ARGUMENT FOR THE GOVERNMENT

2           MR. TOBIN:  Your Honor, I always like to start by

3   making reference to the recommendation made by United States

4   Probation.  The way I read the probation recommendation -- I

5   want to make sure I understand it, and we have talked about

6   it and -- is that I think they're holding off making a

7   definitive recommendation until a study is done of the

8   defendant's home.  But it appears barring anything troubling

9   about that inspection, I think they're going to recommend

10  release.  Is that right?

11          THE PROBATION OFFICER:  I think if the Court

12  orders the location monitoring, then we would go and do a

13  home visit to make sure that it's suitable.

14          MR. TOBIN:  Okay.  And I do that only because I

15  like from the very beginning to say if I'm in agreement with

16  probation or if I disagree with probation, most

17  respectfully, and explain perhaps why reasonable individuals

18  or entities can come to different conclusions.

19          The United States would ask in this case that the

20  defendant be detained, and we do that because we are

21  obviously very troubled by the nature of this offense, and

22  we're also very troubled --

23          I've had the opportunity to see all or most of the

24  videos and the still photograph that were referenced in the

25  criminal complaint affidavit, and --

1        You know, we often talk about child pornography.

2 We often take for granted just how horrendous it is and how

3 it depicts the exploitation of children.  But actually

4 looking at it is really a very moving and very disturbing

5 and very troubling experience.

6        I've been around this sort of stuff for a long

7 time, but these videos of children essentially being raped

8 and penetrated at a very young age are very, very troubling.

9 And it tells us so much, I think, about the mind -- not just

10 of the every day person who looks at this, but of the man

11 who sits before you today.

12        Any individual who could seek out and look at an

13 eleven-year-old or a ten-year-old being penetrated by an

14 artificial penis and then by an adult, I'm not sure that he

15 needs to be in society while those portions are hanging over

16 his head.

17        But this defendant I'm particularly concerned

18 about because, Judge, he lives by himself.  And if, in fact,

19 the Court does deem it appropriate to release him, I would

20 ask that there be a third-party custodian.  Somebody who

21 takes it upon themselves, somebody the Court trusts, who

22 will actually reside with the defendant to ensure that he is

23 compliant in the other conditions that surely the Court

24 would impose such as the bracelet, but more importantly in

25 this case the further victimization of children by not

1  having access to the Internet or not having access to a

2  smartphone that gives access to the Internet.

3          I'm also very troubled, because this defendant has

4  a ten-year-old daughter.  A ten-year-old daughter.  One of

5  the videos we looked at involved a ten- and an

6  eleven-year-old girl.  The eleven-year-old girl penetrating

7  the ten-year-old or maybe it was vice versa with an

8  artificial penis, and then one of those girls being raped by

9  an adult.

10         We have no evidence that the defendant has

11  sexually assaulted his child, and I don't mean to -- I don't

12  mean anything other than he has a sexual attraction, I would

13  suggest, to ten- and eleven-year-old kids.  His daughter is

14  it approximately that age.

15         If this Court deems it appropriate to release him,

16  I would ask most respectfully that the Court require no

17  unsupervised visitation.  She comes over every other weekend

18  and one night a week, and that's just unacceptable.

19         So if the Court is going to release him, he should

20  have to live with someone who's a third-party custodian.  He

21  should have no unsupervised contact with his daughter or any

22  other children.  The house should be devoid of all

23  mechanisms by which the Internet can be accessed.

24         I know probation is asking that whoever else lives

25  in the house can have access to the Internet but it has to

1 be password protected.  I don't think that's sufficient.

2 Most respectfully, I think that there has to be a house

3 without any access to the Internet.

4        I also, of course, would be in favor of the

5 limitation on mobility not only with the bracelet but that

6 only for the specified visits or appointments that have been

7 mentioned or recommended by probation.

8        So he's a father.  He has access to a child.  Also

9 his girlfriend has a fourteen-year-old child and also still

10 a minor child.  That troubles me too, the access to that

11 child.  Even if the child's mother's not troubled, I am, and

12 we all should be.  And I would ask for no unsupervised

13 contact with any child between eight to fourteen years old.

14        I don't mean to be equivocating.  I'm going back

15 and forth between please don't let him out, we think that

16 he's a risk; but if you to, please put these in place.

17        One final point is I understand that the defendant

18 came over here in 1980 from Belarus.  I understand that he

19 claims to have no family or know anybody over there, and I

20 certainly recognize that he has a U.S. citizenship.  All I

21 point out, though, is here is an individual who does

22 perhaps.  Despite what he says to the contrary, he may still

23 have contacts in a foreign country.

24        The prospect of going to prison nobody likes.

25 Some folks might be willing to take off.

1           I will note that the defendant makes a handsome

2  salary of $110,000 a year.  He has hundreds of thousands of

3  dollars in investments.  I suspect he could live royally

4  perhaps in Belarus on, you know, a third of a million

5  dollars or whatever he has in savings.

6           So I throw that into the mix, because the

7  government is concerned with this kind of case that the

8  defendant may avail himself of fleeing, notwithstanding the

9  fact that his passport can be confiscated.  He obviously

10 travels frequently in Europe by his own admissions, so he's

11 not somebody who's, you know, afraid to go more than 40

12 miles from their home.

13          So Your Honor, I'll make this very brief, and I'll

14 end it here.  We're very concerned about the defendant.

15 We're concerned about him in society.  There's virtually no

16 way to keep him away from children.  We believe that he

17 poses a risk.  These videos were filthy and disturbing.

18          And although my learned defense brother can talk

19 about Trojan horses and manipulating and taking over other

20 computers, at this juncture there's absolutely no evidence

21 whatsoever.

22          The computer at his IP address in his house which

23 is password protected was accessing child porn.  And I don't

24 think any of us should feel any better that we've only found

25 seven videos of children being essentially tortured.  I

1  think that's enough to cause concern.  We know of that one

2  day.  We don't know what else is on the other computers.

3  But we shouldn't speculate.  Even if it's only seven videos

4  and one image, it's disturbing.

5          He should stay in jail.  He's a threat to society,

6  and I fear that he may also be a flight risk.

7          Thank you, Judge.

8          THE COURT:  All right.  Mr. Hanye?

9               RESPONSE FROM THE DEFENDANT

10         MR. HANYE:  The Sentencing Commission is concerned

11 that they're -- with the number of images, and Mr. Tobin

12 knows that full well, so it's a relevant factor.

13         I do want to address probable cause.  I would say

14 if there is probable cause here, it's barely, because it is

15 eight images that were created nearly four years ago.

16 Possibly one may have been accessed in January of 2015.

17         The entire basis of this investigation depends on

18 whether the NIT technique actually does what it's supposed

19 to do, which is correctly identifies the IP address that's

20 accessing the website.  The government chose to put on the

21 detective who that's not his area of expertise.  He can't

22 tell us whether it actually works the way it's supposed to.

23 And that was a choice by the government perhaps to not have

24 questioning on that.

25         The whole purpose of TOR, which I do believe

1 stands for The Onion Road, but it's a browser that is

2 designed to anonomize the users.  What better way to

3 anonomize one's self than taking over somebody else's

4 computer?  That's for the Court to determine as to the

5 probable cause standard, but at least on the evidence we

6 have here we don't know that that's not what happened in

7 this case, because there's no way to tell.

8        As to detention, I would say the government's

9 argument basically asks for a de facto detention order in

10 all possession of child pornography cases, and that's

11 certainly not what the statute calls for.  The Section 3142

12 includes conditions which have been incorporated into

13 probation's recommendations that would apply to cases like

14 this.

15       And certainly there's many reasons to believe that

16 Mr. Levin is going to comply with any conditions that the

17 Court imposes.

18       As to Mr. Tobin's two additional requests, we do

19 have someone who can be a third-party custodian.  Mr. Levin

20 lives by himself, but his older brother, Greg Levin who's

21 present in court today, informed probation that he would be

22 happy to move into Alex Levin's two-bedroom apartment and

23 act as a third-party custodian.  That was broached in a

24 conversation this afternoon.

25       Mr. Levin also would not object to a condition

1  that he have no unsupervised contact with his daughter.

2  Certainly his ex-wife is going to find out about the

3  allegations, and that's going to be up to her whether he has

4  any contact with his daughter.  It can be arranged to have

5  someone who's aware of the allegations supervise any

6  contact.

7         There's no need for him to have contact with the

8  14-year-old daughter of -- excuse me -- son of his

9  girlfriend.

10        The government is raising the specter of child

11 abuse of his own daughter, and I just want to confront that

12 directly.  There is no such allegation in any way here

13 whatsoever other than Mr. Levin is an appropriate father, so

14 I would like to put that to rest completely.

15        Mr. Levin, his stable employment is a factor that

16 favors release.

17        His education, a master's degree, is a factor that

18 favors release.

19        His lack of any prior record whatsoever favors

20 release.

21        The conditions that are imposed or suggested by

22 the probation department all are -- would reasonably assure

23 both his appearance and the safety of the community.

24        I would make two -- I would recommend two small

25 adjustments.  In paragraph 10 I would ask the Court to

1  consider a curfew rather than home detention.  Just because

2  I expect that there's going to be so many reasons for him,

3  so many exceptions to the home detention, that it would just

4  simply be more feasible for everyone to have a curfew.  And

5  I would leave that in Your Honor's hands obviously.

6          But he is employed, and he expects to be able to

7  go back there.

8          And travel -- in condition 12, I would --

9          THE COURT:  But his employment involves the use of

10 computers.

11         MR. HANYE:  It involves the use of his computers

12 at work which --

13         There is no allegation that there was any access

14 while he was at work.  Certainly he takes his employment

15 into risk were he to do so.

16         THE PROBATION OFFICER:  Unfortunately, I would

17 consider it a third-party risk, Your Honor.

18         THE COURT:  That's what I was afraid of.

19         THE PROBATION OFFICER:  I would ask the Court that

20 that unfortunately he's going to --

21         In my opinion and recommendation respectfully he'd

22 have to find another job.

23         MR. HANYE:  I would ask the Court to not make that

24 order, but if that was the Court's order, he certainly would

25 prefer to be released and looking for another job rather

1  than losing his job anyway by being detained.

2           THE COURT:  All right.  Well, I think it's

3  premature.  I think the brother has to be interviewed, I

4  think the house has to be viewed, and then we'll look at

5  things.  But I think it's premature right now.  We'll do it

6  as quickly as we can.

7           MR. HANYE:  Thank you.

8           THE COURT:  I do at this time make a finding that

9  there's probable cause to believe that the defendant has

10 committed the crime as set forth in the criminal complaint,

11 and as soon as the reports are available, we'll confer.

12 I'll give you a prompt hearing.

13          MR. HANYE:  Should we pick a date now?

14          THE COURT:  Well, no.  I have to wait and see how

15 long it takes to get the interview and for her to get out

16 there.  I can't predict that, but it will be quick.

17          MR. HANYE:  I won't be able tomorrow.  I have to

18 be in Worcester tomorrow afternoon.

19          THE COURT:  All right.  Well, it won't be

20 tomorrow, so.

21          MR. HANYE:  Okay.

22          THE COURT:  All right.  So in the interim the

23 defendant is remanded to the custody of the United States

24 Marshal Service.

25          MR. HANYE:  Thank you.

1          MR. TOBIN:  Thank you, Your Honor.

2          THE COURT:  You're welcome.

3     (Court adjourned at 3:58:03 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

38

CERTIFICATION

1

2     I, Judy Bond Gonsalves, a court approved transcriber,

3 certify that the foregoing is a correct transcript from the

4 official electronic sound recording of the proceedings in

5 the above-entitled matter.

6

7

8 _____     May 1, 2016

9   Judy Bond

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25