**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA, . CRIMINAL NO. 1:15-cr-10271-WGY-1
     Plaintiff        .
                   . BOSTON, MASSACHUSETTS
       v.        . AUGUST 21, 2015
                   .
ALEX LEVIN,          .
     Defendant      .
. . . . . . . . . . . . .

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:  UNITED STATES ATTORNEY'S OFFICE
                      BY: David G. Tobin, AUSA
                      One Courthouse Way
                      Suite 9200
                      Boston, MA 02210
                      617-748-3965
                      david.tobin@usdoj.gov

For the Defendant:  Joshua Robert Hanye, Esq.
                      Federal Public Defender's Office
                      5th Floor
                      51 Sleeper Street
                      Boston, MA  02210
                      617-223-8061
                      joshua_hanye@fd.org

Court Reporter:

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1                          **I N D E X**

2  **WITNESSES**          **DIRECT**    **CROSS**    **REDIRECT**    **RECROSS**

3  **Defendant's:**

4  GREGORY LEVIN          18          22

5  GABRIELLE LEVIN        26          28

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1  COURT CALLED INTO SESSION

2  (2:34:44 P.M.)

3          THE CLERK:  The United States District Court for

4  the District of Massachusetts is now in session, the

5  Honorable Marianne B. Bowler presiding.  Today is Friday,

6  August 21, 2015.  The case of U.S. v. Levin, Magistrate

7  Judge No. 15-2192, will now be heard.

8          Will counsel please identify themselves for the

9  record?

10          MR. TOBIN:  Good afternoon, Your Honor.  David

11  Tobin on behalf of the United States.

12          THE COURT:  Thank you very much.

13          MR. HANYE:  Josh Hanye for Mr. Levin.  Good

14  afternoon, Your Honor.

15          THE COURT:  Good afternoon.  Well, you're on your

16  feet, Mr. Hanye.

17          MR. HANYE:  Very well.  I'm asking the Court to

18  release Mr. Levin to his home either with or without a

19  third-party custodian.  The third-party custodian was not

20  recommended in probation's initial recommendation.  And I

21  will certainly address information in the report, the

22  memorandum that was submitted today.

23          We went over Mr. Levin's lack of criminal history,

24  his education, his long work history, his involvement with

25  his daughter.

1          What I don't think I had a chance to respond to is

2   Mr. Tobin's argument of being a flight risk and the

3   suggestion that he might go to Belarus.  Mr. Levin is as

4   much an American as anybody else in this courtroom.  He's a

5   citizen.  He's been in this country for 35 years.  He's

6   lived in Massachusetts for 35 years.

7          He acknowledged in the presentence interview -- or

8   excuse me -- the Pretrial Services interview that he may

9   have relatives in Belarus that he doesn't know about.  His

10  parents are very old.  They're in their eighties, and

11  they're very ill, so presumably there's somebody related to

12  him back there.  He just doesn't know who they are.  And Mr.

13  Tobin, I would suggest, engaged in speculation that somehow

14  he's not being truthful about that.  Not to mention how

15  would he get there without a passport?  Not to mention that

16  I don't think Belarus is an attraction for someone to leave

17  their entire life behind, including his daughter, his ill

18  parents, his life, his community, the place he's called his

19  home since he's been a very young boy.

20          He won't have any means to get anywhere out of

21  this country given that it seems quite clear that just by

22  the fact of his detention thus far he's not going to have a

23  job to go back to and may have significant restrictions on

24  what kind of job he can engage in.  So I don't believe that

25  there's any indication whatsoever of Mr. Levin being a

1 flight risk.

2          He is a also not a danger to the community, Your

3 Honor.  He denies the charges.  And at this point the

4 government cannot tell us -- and this is based upon the

5 testimony of Detective Sullivan -- whether or not Mr.

6 Levin's computer was hijacked or was being subjected -- was

7 controlled by a remote computer or someone else.

8          What we don't know is whether that Network

9 Investigative Technique actually result in the final IP

10 address within a system that is designed to hide those IP

11 addresses.

12          So he's presumed innocent, as the Court knows.

13 Even if we were to consider on dangerousness that he viewed

14 child pornography, there is no suggestion -- there's no

15 information whatsoever that he was ever a danger to any

16 children.

17          Now, it appears that there may be -- there's

18 indications of children living in his building.  I want to

19 respond directly to the suggestion in the memorandum today

20 that he was less than candid about that in the Pretrial

21 Services interview.  I was present for that.  What he said

22 was he did not know if children lived in the building or

23 not.

24          The photograph that I've seen from probation is

25 from the other side -- the entrance on the other side of the

1 building.  So there's a balcony there that has some

2 children's bicycles and maybe some Big Wheels for younger

3 children.

4        That's not the entrance that Mr. Levin ever goes

5 in and out of because his parking spot is on the other side

6 of the building, so he'd have no reason to know what's back

7 there on that balcony.  I also don't know when those toys

8 were put there or if children, in fact, live there or if

9 it's the grandparents who live there or for one parent who

10 lives there.  I don't know how often they're there.

11        I've spoken not only to Mr. Levin but to his

12 brother Greg Levin, his girlfriend Lynn Femme (phonetic) who

13 are here again today.  They are there regularly and have not

14 seen children there.  It's simply too far a leap to say that

15 he was not candid in the interview.

16        And I don't think the possible presence of

17 children there would be a reason to detain him, because even

18 if the government's theory that he viewed child pornography

19 is correct, he did so without ever engaging in direct

20 contact with children or presenting a harm to children in

21 any way.

22        So it's not appropriate -- it's not justified to

23 consider him a threat to children just because they're in

24 the area.  There's no place he's going to be able to go

25 where there's not children in the area.

1          I'm going to ask the Court to release him on

2  conditions that would require him to be electronically

3  monitored.  Essentially the conditions that were contained

4  in the first -- in probation's first recommendation.

5  Electronic monitoring, home detention except for employment

6  should he be able to find any.

7          I would very much ask the Court to consider

8  allowing him to find work subject to approval by the

9  probation department that may require access to a computer.

10 It's very difficult to find any kind of work that doesn't

11 have access to a computer.

12         And again I would say that even assuming the truth

13 of the charges, there's no indication that he ever accessed

14 these images while at work.  There's an additional greater

15 risk --

16         THE COURT:  Computer, but maybe no Internet.

17         MR. HANYE:  Well, we would have to see what the

18 work is, and we would have to have a discussion with

19 probation and make a specific proposal.  I would say we'd

20 have to come back before the Court should he be able to find

21 work in the future.  And I would leave the Court to consider

22 what an appropriate condition is on that point.

23         I want to address the suggestion that Mr. Levin

24 was not candid about his drug use because there was a bong

25 that was present on a table in his apartment.  His brother

1  Greg Levin was there.  He was the one who let the probation

2  in to conduct the home assessment.

3        The picture that was sent to Ms. Fox was on a

4  table after the probation officer doing the assessment took

5  it out of a box on the floor and placed it on the table to

6  take the picture.  The bong got in the box because his

7  girlfriend had gone there to try to clean up the apartment

8  in the wake of the execution of the search warrant and had

9  taken it from inside the closet.  They are available for any

10 inquiry for the Court or any inquiry from the probation

11 department.

12       But the version that was presented in the

13 memorandum today was just not accurate.  It just was a

14 result of a game of telephone -- of not everyone having the

15 exact information.  He was candid.  He said that he had --

16 he smoked marijuana.

17       Obviously he can't have that bong, so in trying to

18 make the apartment suitable his family and his girlfriend

19 were trying to make it appropriate for him to be released

20 there.

21       A land line that's appropriate for electronic

22 monitoring purposes has been installed.

23       Mr. Levin remains ready to be a third-party

24 custodian.  As to the eight-year-old charges that were

25 dismissed against him that were brought by his daughter, I

1 don't think that that should be -- would negate him to be a

2 suitable third-party custodian.  His other daughter who was

3 aware of those charges made by her older sister is here

4 today.  This is Mr. Alex Levin's niece.  And she's here to,

5 you know, express support both for Alex Levin and has told

6 me that she is well aware of the reasons why her older

7 sister made those allegations up.  That she's lived with

8 them all as a family her entire life.  She's very supportive

9 of her father.  There's nothing like that in his background.

10 Her sister -- her older sister is very troubled and is

11 estranged from the family and was going through severe drug

12 use at the time.

13          That being said, I don't think a third-party

14 custodian is required.  I think Mr. Levin has shown every

15 indication in his 49 years that he's going to comply with

16 any conditions that this Court imposes.  He has significant

17 obligations in the community.  He has his daughter that he

18 has faithfully been not only supported financially through

19 child support but also through regular custody.  Every other

20 weekend she's with him, and she's with him once a week.

21          I spoke to his ex-wife, the child's mother this

22 week, and the concern was how do we explain this to his

23 daughter, because she is devastated by his absence.

24          THE COURT:  How old is she again?

25          MR. HANYE:  She's nine years old.

1    He's prepared to accept any conditions that the

2  Court would impose related to contact with minors.  I would

3  suggest that he should at least be able to have -- at least

4  be able to have supervised contact with his daughter for his

5  daughter's sake to maintain that relationship.

6    And again, no one is suggesting that he's ever

7  been inappropriate with the child in any way.

8    I come back to the first argument I think I made

9  which is that the government's position essentially is that

10  anyone with these charges should be detained, and I would

11  suggest that all the information that's been presented to

12  the Court and all the various options would reasonably

13  assure the safety of the community and certainly Mr. Levin's

14  presence, and I would ask the Court to adopt those

15  conditions.

16    THE COURT:  Mr. Tobin?

17    MR. TOBIN:  Your Honor, I think that a fundamental

18  misunderstanding as far as being held by Mr. Hanye is when

19  he says that the defendant is not a threat to children.  I

20  took that to mean that there is no evidence of any contact

21  offenses against children, and that is a true fact.

22    The issue, though, is I would suggest he is a

23  threat to children, because every time he views child

24  pornography he commits a crime and children are victimized.

25  That is why we penalize and punish this.  We are not the

1 morality police, *per se*.  We believe -- or society believes

2 and the laws reflect the belief that every time an

3 individual downloads, goes to a site or looks at children

4 being raped and sexually assaulted, the child again is being

5 victimized.  And all children are potentially victimized,

6 because you're helping to create a market.

7           So I'm not here suggesting that this defendant is

8 going to go out and rape a child.  I do, however, believe

9 that there are no safeguards that this Court can put into

10 place that will keep him if he wants to from accessing child

11 pornography, and that troubles me.

12           If the Court is inclined to release him --

13           And again, we would recommend that you not.  And I

14 believe that probation has thought long and hard about this,

15 they investigated this, and I respect their position and of

16 course you do as well, but reasonable people can see things

17 differently.

18           But I agree with probation that at this time there

19 is not a suitable place or a suitable plan in place for his

20 release.

21           He certainly in my opinion would need a

22 third-party custodian.  And notwithstanding the arguments of

23 my brother, his brother, Mr. Levin's brother, is absolutely

24 unsuitable for that task.

25           It is true he was never convicted of rape of

1  child, but it is also true that there was sufficient

2  evidence to charge him with that heinous crime.  It was

3  *nolle prossed.*  We don't know why.  We are told a story

4  about a troubled child.  Who knows.

5           But the idea of having an individual who is now

6  charged with a sexual offense involving children, of having

7  a third-party custodian, an individual who has previously

8  been charged with a child sexual contact offense I think is

9  grossly inappropriate.

10           I do think this defendant, if he is to be

11  released, needs to be under the watchful eye of a

12  third-party custodian who can actually ensure that this

13  defendant is not harming children by looking at child

14  pornography.

15           The unfortunate reality is it is very easy to find

16  a computer, it is very easy to find a smartphone, and I do

17  not believe that it has been demonstrated that there are

18  safeguards that can be put in place.

19           Now, the defendant, if I understand my brother

20  correctly, has lost his job or is about to lose his job.

21  That's not a good situation.

22           THE COURT:  Has he lost the job?

23           MR. HANYE:  We don't know.  But that's a no-win

24  situation, because it sounded like he was not going to be

25  able to continue that job anyway.  I'm sure that Mr. Tobin

1 would ask for conditions that would not allow him to

2 continue with that job.

3         THE COURT:  Does his employer know about these

4 circumstances?

5         MR. HANYE:  We don't know.  I'm not aware that

6 anybody has contact.

7         MR. TOBIN:  Well, he just indicated -- if you

8 can't hear him -- he highly doubts he has a job right now.

9         So now we have an individual in the community

10 presumably without employment.  That's bad for two reasons.

11 One is because he doesn't have employment and he has idle

12 time on his hands, time to do whatever he might do with

13 regard to these trial offenses.

14         My brother says Mr. Tobin can never envision a

15 situation where an individual is released.  That's just

16 simply not the case.  There are individual situations that

17 are not considered catalog what they might be.

18         I think this individual living on his own without

19 an appropriate third-party person with a ten-year-old child

20 --

21         THE COURT:  Nine.  Nine-year-old.

22         MR. TOBIN:  Excuse me.  -- a nine-year-old child I

23 just don't think he's a suitable candidate.  He can find

24 another place to live, and he can find another third-party

25 custodian that we should come back and consider.  Those

1 would be changed circumstances.

2          With regard to whether or not he was frank and

3 candid with the Court with regard to children, obviously I

4 don't know, but probation went over there on one occasion

5 and found telltale signs of children.

6          He's lived there for some period of time.  If

7 there are kids in that building, one would think he would

8 know, and not just because there are cartwheels or Big

9 Wheels on the porch.  It's hard for me to believe that he

10 was unaware that there were children in the building if, in

11 fact, there really was.  So I do question the candidness.

12          The other thing that my brother said which

13 troubled me was that if I understood him correctly, that the

14 defendant's brother and the defendant's girlfriend went over

15 to the house.  He wasn't supposed to have a bong, so they

16 made the house into such a way it's someplace he could live.

17 I don't think he meant that they were going over to hide

18 evidence of his drug use.  I hope not, because then we have

19 a family --

20          MR. HANYE:  He disclosed his drug use.

21          MR. TOBIN:  Well --

22          MR. HANYE:  That's in the bail report.

23          MR. TOBIN:  The point is, his disclosure -- the

24 point is --

25          MR. HANYE:  He can't have a bong there --

1          THE COURT:  One person at a time.

2          MR. TOBIN:  The point is, if I understand my

3 brother correctly, and I may have misunderstood him, the

4 family went over, they saw a bong, and they put it in a box

5 so it wouldn't be readily available to probation.  That

6 doesn't sound like a support network that's going to be

7 there supervising him properly.

8          So I understand that these can be tough calls, and

9 I understand reasonable people can see things differently.

10 There may be a situation that can be fashioned in the future

11 where he can be released.  I just don't think that the parts

12 are -- or that the components of that are here now.

13          And if you were to release him, then certainly

14 there should be no computer use whatsoever.  There should be

15 a third-party custodian, and he should be supervised on a

16 regular basis by the third-party custodian, not somebody

17 who's working, you know, eight hours a day plus commuting

18 another two hours presumably.  I just think it's a danger at

19 this point.

20          MR. HANYE:  If the third-party custodian did not

21 have a job, that would be argued as a reason against that

22 person being a third-party custodian.  The working is

23 evidence of ties to the community and a stable lifestyle.

24          Mr. Greg Levin could take Alex Levin to work with

25 him if the Court thought that was most appropriate.  If he

1 doesn't have a job, the government argues that that's in

2 favor of detention.  If he has a job with computers, the

3 government doesn't want him to be able to have that job.  So

4 it goes both ways.

5        I'm glad that Mr. Tobin clarified that he's not

6 concerned about Mr. Alex Levin having direct contact to

7 physically abusing a child, that the concern is related to

8 accessing child pornography.  That is certainly -- the harm

9 of that is not denied.  That is a sentencing question, and

10 there are reasonable conditions that can effectively ensure

11 that he's not going to do that if he were to be on pretrial

12 release.

13        I want to add just a couple of things that I

14 didn't add the first time.

15        Just to clarify, his girlfriend and his brother

16 are happy to take the stand and answer any questions from

17 Mr. Tobin --

18        THE COURT:  Well, if you want to call them, it's

19 up to you.

20        MR. HANYE:  Well, I suppose we should do that.  I

21 suppose we should do that as opposed to the suggestion that

22 they were going to hide evidence.  If Mr. Tobin is standing

23 by that assertion, then I would like to call them.

24        MR. TOBIN:  Your Honor, if I may?  I apologize.

25 That was merely my take on what my brother had said.  That

1  they went over to the house, they saw the bong, they didn't

2  think that was appropriate, that was his exact word, and so

3  they put it into a box.  If he's telling us that I

4  misinterpreted what he said, I'm happy to accept that.

5          There is one correction, though, that's critical

6  that I make.

7          Mr. Hanye just said I'm happy to see that Mr.

8  Tobin isn't concerned about him being a contact offender.

9  Nothing could be further from the truth.  I am deathly

10  afraid that as an individual attracted sexually to

11  ten-year-old and eleven-year-old children, that he may have

12  been or may be.

13          It is true I have no evidence that he has done

14  that, so I can't argue that he has done that.  Am I

15  cavalierly not concerned about that?  No.

16          The data that I have read, the materials that I

17  have been made aware of is what I've been told is that a

18  percentage -- some would say high, but I don't have the data

19  to tell you -- that people act on their sexual desires.

20  People with mainstream desires act on them.  People with not

21  mainstream desires act on them.

22          I don't know if he's ever acted on them.  I don't

23  know if he ever will act on them.  I'm very concerned about

24  that.  I just have no evidence he's acted on them.

25          So I just don't want it to be on the record that

1 Dave Tobin's not concerned he's going to touch children.  I

2 am concerned about that.

3          MR. HANYE:  Well, we're here to talk about the

4 evidence, so.  We'll leave it at that, of which there is

5 none.

6          I would call -- if I may have a moment to speak to

7 Mr. Levin, I would call him as a third-party custodian.

8          THE COURT:  Certainly.

9          MR. HANYE:  The defense would call Mr. Gregory

10 Levin.

11          THE COURT:  If you could please come forward and

12 be sworn?

13          DEFENSE WITNESS, GREGORY LEVIN, SWORN

14 THE CLERK:  You may be seated.

15                         DIRECT EXAMINATION

16 BY MR. HANYE:

17 Q.   Sir, could you please tell us your name?

18 A.   I'm Gregory Levin.

19 Q.   How do you spell your last name?

20 A.   L-E-V-I-N.

21 Q.   And are you related to Alex Levin?

22 A.   I'm his brother.

23 Q.   And older or younger?

24 A.   Older.

25 Q.   How old are you, sir?

1  A.   I'm 54.

2  Q.   Where do you live?

3  A.   In Stoneham, Massachusetts.

4  Q.   Mr. Levin, are you prepared to act as a third-party

5  custodian for your brother Alex Levin?

6  A.   Yes, I do.

7  Q.   And are you aware generally of what that requires?

8  A.   Yes.

9  Q.   Are you, sir, prepared to move into Alex Levin's home

10 in order to act as a third-party custodian?

11 A.   Yes, I will.

12 Q.   Did you do anything within the last week or so to try

13 to make his home suitable for Alex Levin's release back to

14 his house?

15 A.   Yes.  Myself, my wife and his girlfriend he went to

16 apartment, cleaned up, because it was trashed after police

17 officers, whoever was there.  We --

18 Q.   Let me ask you another question.  Did you find a bong?

19 A.   Yes, we did.

20 Q.   Where was the bong?

21 A.   It was in a closet.

22 Q.   What happened to the bong?

23     Were you there for a home assessment by a probation

24 officer?

25 A.   Yes.

1  Q.    Where was the bong at that time?

2  A.    It was in a cardboard box ready to be thrown away.

3  Q.    Okay.  And did the probation officer become aware of

4  the bong?

5  A.    He saw it in a box, picked it up, put it on the counter

6  and took a picture of it.

7  Q.    All right.  Why were you going to throw the bong away?

8  A.    Because it not supposed to be there.

9  Q.    Did you do anything in regards to installing a phone

10 line?

11 A.    Yes, I did.

12 Q.    And can you tell us the status of that phone line?

13 A.    It's all set to go.

14 Q.    It's a land line without any other services on it

15 whatsoever?

16 A.    Any voicemail -- umm, voicemail, without any call

17 waitings, nothing.  Just a simple phone line.

18 Q.    And do you work, sir?

19 A.    Yes, I do.

20 Q.    Where do you work?

21 A.    I own a jewelry store in Dartmouth, Massachusetts.

22 Q.    What's the name of the store?

23 A.    Ernie Ross Jewelers.

24 Q.    How long have you owned that store?

25 A.    Probably around six years.

1  Q.   And what are your hours working there?

2  A.   Weekdays I work ten to five, we closed Wednesday and

3  Sunday, and Saturday nine to three.

4  Q.   Would Alex Levin, your brother, be able to come to your

5  store during your work hours?

6  A.   Absolutely.

7  Q.   Could he be there without accessing the Internet?

8  A.   I have one computer that I use.  The rest of them I can

9  disconnect no problem.

10 Q.   Could you install a password on the one that you use

11 and agree to not provide that to your brother?

12 A.   A hundred percent.

13 Q.   And would you agree to monitor his activities into his

14 own home to make sure he's not accessing the Internet?

15 A.   Yes.

16 Q.   Mr. Levin, are you prepared to post any money in the

17 form of a secured bond in order to assist Mr. Levin's

18 release?

19 A.   We have a little money.  If we have to, we can post

20 some money.

21 Q.   How much would you be prepared to post?

22 A.   Well, money are tight.  Whatever Court will allow.  As

23 little as possible we'll post it.

24 Q.   Had you suggested $2500 at one point?

25 A.   That, I can do.

1              MR. HANYE:  I have no more questions.  Actually, I

2  withdraw that.

3  Q.   Are you prepared to sign what's called an unsecured

4  bond which you would agree to pay back money should Mr.

5  Levin -- should Alex Levin violate any of the conditions of

6  his release?

7  A.   Yes, I will.

8              MR. HANYE:  I have no more questions.

9              THE COURT:  Cross-examination, Mr. Tobin?

10             MR. TOBIN:  Briefly, Your Honor, if I might.

11                     CROSS-EXAMINATION

12  BY MR. TOBIN:

13  Q.   I'm sorry.  Where is the bong now?

14  A.   It's still in the house.  After the probation officer

15  saw it and left it there.  I did not want to throw it away

16  and cause more -- like sound like I'm trying to hide it.  If

17  Court will tell me or you will tell me tonight, it will be

18  in a garbage can.

19  Q.   Have you in the past been to your brother's apartment

20  prior to going over to clean it as you've just described?

21  A.   Yes, I did.

22  Q.   And it's a large complex with many apartments and

23  actually a number of buildings; is that true?

24  A.   Correct.

25  Q.   And had you ever seen children at that complex?

1  A.   I did on the far side where the swimming pool is.  I

2  don't know whether they are from that building or go there,

3  but I did see.

4  Q.   And did you see signs of children in your brother's

5  building when you were there most recently?

6  A.   No.

7  Q.   You didn't see bicycles --

8  A.   Honestly, no.  Until probation officer pointed out that

9  he saw a child on the other side of the building, I had no

10 idea.  From the back where we come in, people park there, I

11 saw -- you hardly see anybody.

12 Q.   And did the probation officer point it out to you do

13 you mean here in court or do you mean --

14 A.   No, no, no.

15 Q.   -- when you were there?

16 A.   The one who came to us at the apartment.

17 Q.   Oh, he or she pointed it out to you?

18 A.   She.  She said -- she asked me the same question,

19 whether I was aware of any kids in the building, which I

20 didn't.  And he said I'm sure there is somebody on the other

21 side of the building.

22 Q.   And do children ever accompany their parent to your

23 jewelry store?

24 A.   Yeah, sometimes.

25 Q.   And what would you do if you were the third-party

1 custodian in charge of your brother or at least to supervise

2 him and you found him on the Internet?  What would you do?

3 A.   As recommended, I would report to probation officer.

4 Q.   And you'd be able to do that against your brother?

5 A.   I have no problem doing that.

6 Q.   Now, how old was your brother when he came to the

7 United States?

8 A.   I think he was 12 or 13.

9 Q.   And you were, what, just a couple of years older?

10 A.   No.  I'm five years older.

11 Q.   Okay.  So you were a little older.  Okay.

12      Did you ever observe your brother looking at

13 pornographic websites?

14           MR. HANYE:  Objection.  Outside the scope.

15           MR. TOBIN:  It's cross-examination, Your Honor.

16 Is he a suitable candidate.  If he knows that his brother's

17 looking at children on the Internet, then he's probably not

18 suitable.

19           THE COURT:  He can answer.

20

21 BY MR. TOBIN:

22 Q.   Have you ever seen your brother to be looking at

23 inappropriate or websites or photos on the computer of

24 underage children engaged in sex acts?

25 A.   Absolutely not.  You did say underage; right?

1  Q.   I did say underage.

2  A.   Absolutely not.

3  Q.   Well, do you know is he a -- does he look at -- it's

4  legal, but does he look at pornography on the computer?

5          MR. HANYE:  Objection.  Relevance.

6          MR. TOBIN:  Well, he said -- well, I'll withdraw

7  the question.

8          THE COURT:  All right.

9          MR. TOBIN:  I'll withdraw the question.

10  Q.   I have no further questions, but thank you very much.

11  A.   Thank you.

12          THE COURT:  Any redirect?

13          MR. HANYE:  No.  Thank you, Your Honor.

14          THE COURT:  All right.  You may step down.

15          THE WITNESS:  Thank you.

16          THE COURT:  Any further witnesses?

17          MR. HANYE:  If I may have just a moment?  Defense

18  would call Gabby Levin.

19          THE COURT:  All right.  If you'd please come

20  forward and be sworn?

21          THE CLERK:  Please raise your right hand.

22     DEFENSE WITNESS, GABRIELLE LEVIN, SWORN

23  THE COURT:  And I'll just ask you to speak into the

24  microphone and keep your voice up.

25          THE WITNESS:  Oh, sorry.  Okay.

1                    DIRECT EXAMINATION

2  BY MR. HANYE:

3  Q.   Ma'am, could you please state your name?

4  A.   Gabrielle Levin.

5  Q.   And are you related to Alex Levin?

6  A.   Yes.  He's my uncle.

7  Q.   And is Gregory Levin your father?

8  A.   Yes.

9  Q.   Where do you live, ma'am?

10  A.   I live in Stoneham, Massachusetts.

11  Q.   Do you live with your father?

12  A.   I live with my parents, my mom and my dad.

13  Q.   And do you work?

14  A.   Yeah.

15  Q.   What do you do?

16  A.   I'm a medical assistant.

17  Q.   Do you have a sister?

18  A.   Yes, I do.

19  Q.   Older or younger?

20  A.   Older.

21  Q.   What's her name?

22  A.   Jessica Levin.

23  Q.   Any other siblings in your family?

24  A.   No.  That's it.

25  Q.   Are you aware that allegations were made by your sister

1  against your father of sexual abuse approximately eight

2  years ago?

3  A.    Yes.

4  Q.    Were you aware at the time?

5  A.    Yes, I was.

6  Q.    Can you tell us what your sister's situation was at the

7  time the allegations were made?

8  A.    Okay.  She was doing Percocets, and she called me up

9  when I was in the hospital and asked me if I had Perks on

10 me.  She was dealing with these like no-good people who she

11 was dating, and things just got out of hand.

12 Q.    You said you were in the hospital?

13 A.    Yeah.

14 Q.    Why were you in the hospital?

15 A.    I got attacked by a pitbull.

16 Q.    Ever has your father ever made any inappropriate

17 advances toward you?

18 A.    No, not at all.

19 Q.    Did you ever observe anything of concerning in that

20 regard in his dealings with your older sister?

21 A.    No.

22 Q.    And what's your sister's situation now?

23 A.    She is living in Randolph with her boyfriend.  She just

24 had a baby, and we haven't talked for like years already,

25 so.

1 Q.   Okay.  Are you aware of -- well, you said she was using

2 drugs at the time of the allegations.

3 A.   Yes.

4 Q.   Did that continue for some time?

5 A.   I'm not sure.  We haven't talked, so.

6 Q.   Had she had a long history of that?

7 A.   About like a couple years, yeah.

8 Q.   Have you ever observed anything concerning at all about

9 your Uncle Alex's interactions with children?

10 A.   No.

11 Q.   Have you observed him interact with his daughter?

12 A.   I've seen it, but nothing like un- -- like suspicious.

13 Q.   So could you describe that relationship?

14 A.   They go hiking all the time.  They go skiing.  They

15 like to stay active, and that's about it.

16          MR. HANYE:  I have no more questions.

17          THE COURT:  Mr. Tobin?

18                    CROSS-EXAMINATION

19 BY MR. TOBIN:

20 Q.   The allegations made by your sister, that was some

21 seven years ago?

22 A.   I think it was like eight years ago.

23 Q.   And how old is she now?

24 A.   She is 27 I believe.

25 Q.   Do you know if she's still on drugs?

1  A.   I have no idea.

2  Q.   She's never called the house to say, Dad, I'm so

3  terribly sorry --

4  A.   No.

5  Q.   -- for the lies?

6  A.   No.

7  Q.   Never?

8  A.   No.

9  Q.   Was your father actually arrested for that offense?

10 A.   I believe they took him in.  I'm not sure exactly, but.

11 Q.   Thank you very much.

12 A.   Okay.

13            THE WITNESS:  Am I all set?

14            THE COURT:  You are.  Thank you.

15            THE WITNESS:  Okay.

16            THE COURT:  Nothing else?

17            MR. HANYE:  No.

18            THE COURT:  All right.  I'm going to take a brief

19 recess and talk to Pretrial Services.

20            MR. HANYE:  Two quick points.

21            THE COURT:  Okay.

22            MR. HANYE:  His girlfriend Lynn Femme (phonetic)

23 who's here is prepared to post $5,000 secured bond, and I

24 just want to point out that Gregory Levin disclosed this

25 arrest openly to probation when he was being asked about his

1 prior record several days ago.

2          THE COURT:  All right.  We'll take a brief recess.

3      (Court recessed from 3:05:51 p.m. to 3:13:50 p.m.)

4                        AFTER RECESS

5          THE COURT:  All right.  I have a couple of

6 questions after conferring with Pretrial Services.

7          Does Mr. Gregory Levin have a firearms permit?

8          MR. HANYE:  He does not have a permit, does not

9 have any guns.

10          THE COURT:  No?  In his store or anything?

11          MR. HANYE:  No.

12          THE COURT:  All right.  Well, at this point I have

13 conferred with Pretrial Services, and I have concerns.  I

14 don't think this is the right arrangement.  I have on

15 occasion released people in these cases, but --

16          Also does Mr. Levin realize that he would be

17 leaving his wife and daughter for a year maybe?

18          MR. HANYE:  He does.  We've talked about the

19 length of these cases.

20          THE COURT:  Do you understand that?  It could be a

21 year, a year and a half, you couldn't go home and have a

22 night with your wife?

23          GREGORY LEVIN:  Yes, Your Honor, I understand

24 that.

25          THE COURT:  Well, I still don't think it's the

1 right setup.

2          So I won't write an order now.  I'll hold off on

3 it.  If you come back with a solution, another --

4          Ideally, I would rather have him in a place where

5 there's somebody during the day.  So give it some thought,

6 talk to Pretrial, and we'll --

7          But for the moment he's detained.  All right?

8     (The judge confers with the clerk.)

9          THE COURT:  Just hold on one second.  I just want

10 to be sure there was probable cause finding.

11          MR. HANYE:  I recall you made that at our last

12 hearing.

13          THE COURT:  Yes, I see it.  Okay.  All right.

14     (Court adjourned at 3:16:07 p.m.)

15

16

17

18

19

20

21

22

23

24

25

32

1                          CERTIFICATION

2        I, Judy Bond Gonsalves, a court approved transcriber,

3   certify that the foregoing is a correct transcript from the

4   official electronic sound recording of the proceedings in

5   the above-entitled matter.

6

7

8   _____   May 1, 2016
    Judy Bond
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Judy Bond*
**Certified Federal Court Transcriber**
**508.984.7003**