```
 1                  UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MASSACHUSETTS

 3                                No. 1:15-cr-10271-WGY

 4

 5

 6   UNITED STATES OF AMERICA

 7

 8   vs.

 9

10   ALEX LEVIN

11

12                       *********

13

14

15                   For Jury Trial Before:
                     Judge William G. Young

16

17

18                   United States District Court
                     District of Massachusetts (Boston.)
                     One Courthouse Way
19                   Boston, Massachusetts 02210
                     Wednesday, May 29, 2019
20

21                       ********

22

23           REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter
                   United States District Court
24       One Courthouse Way, Room 5510, Boston, MA 02210
                     bulldog@richromanow.com
25
```

```
1                    A P P E A R A N C E S

2

3    ANNE PARUTI, ESQ.
        United States Attorney's Office
4       One Courthouse Way, Suite 9200
        Boston, Massachusetts 02210
5       (617) 748-3310
        E-mail: Anne.paruti.lohnes@usdoj.gov
6       For the United States of America

7

8    J.W. CARNEY, JR., ESQ.
     DANIEL J. GAUDET, ESQ.
9       J.W. Carney, Jr. & Associates
        20 Park Plaza, Suite 1405
10      Boston, Massachusetts 02116
        (617) 933-0350
11      Email: jcarney@carneydefense.com
        for the defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2

3    WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS

4

5    ALEX LEVIN  (Continued.)

6       By Mr. Carney:          4               23

7       By Ms. Paruti:               10

8

9    JOSEPH NICHOLLS  (Recalled.)

10      By Mr. Carney:      25

11      By Ms. Paruti:           34

12
```

```
13   MOTIONS/CHARGE CONFERENCE........................   4

14   CLOSING ARGUMENT BY MS. PARUTI...................  45

15   CLOSING ARGUMENT BY MR. CARNEY...................  60

16   REBUTTAL ARGUMENT BY MS. PARUTI..................  70

17   JUDGE'S CHARGE TO JURY...........................  72

18   JURY QUESTION....................................  91
```

```
19

20

21                     E X H I B I T S

22                   (None marked.)

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                    (Jury enters, 9:30 a.m.)
 3               THE COURT:  Good morning, ladies and
 4      gentlemen.  I hope you all had a very meaningful
 5      Memorial Day weekend.  I do thank you, as I have
 6      throughout the trial, most sincerely, and I mean this,
 7      you were all here right on time, and we didn't get
 8      started on time, and it's no one's fault.  If I knew
 9      whose fault it was, I would tell you.  What happened was
10      there was a severe train accident south of Boston,
11      someone got killed, and that caused buses to be delayed
12      and we were not all here.  It's nobody's fault.
13      Everyone's here now.  We're ready to go.
14           Would you remind the witness.
15               THE CLERK:  I'd like to remind you, sir, that
16      you are still under oath.
17           Do you understand?
18               THE WITNESS:  I do.
19               THE COURT:  And you were inquiring?
20               MR. CARNEY:  Yes, I was, your Honor.
21               THE COURT:  You may proceed.
22               MR. CARNEY:  Thank you.
23
24      DIRECT EXAMINATION BY MR. CARNEY:  (Continued.)
25      Q.  Good morning, Mr. Levin.
```

1    A.   Good morning.

2    Q.   I'd like to go back to ask you a few more questions

3    about your employment history.

4         From 2010 until 2015, where were you working?

5    A.   In 2010 I was self-employed as a project manager, a

6    Program Technical Project Manager.

7              MR. CARNEY:   You'll have to keep your voice up

8    and move closer to the microphone.

9              THE COURT:   Yeah, the mic will move to you, so

10   pull that closer to you, so it's comfortable.

11   A.   In 2010, I was -- is that good?

12             THE COURT:   That's better.

13   A.   Yes, in 2010, I was self-employed as a Technical

14   Program and Project Manager, I worked in health care,

15   um, in the health care industry, the insurance

16   companies.  From 2014 and on -- 2013 to 2015, I was

17   employed at Bank of America as a --

18   Q.   And what did you do at Bank of America?

19   A.   I was a Technology Program Manager there.

20   Q.   Okay.  And what does a Technology Program Manager

21   do?

22   A.   He manages a portfolio of different projects,

23   technical projects.

24   Q.   All right.  And that's where you were working in

25   2015?

1    A.   Correct.

2    Q.   I asked you on Friday about the file-sharing

3    programs, Shiraza and Frostwire.  Do you recall that?

4    A.   I do.

5    Q.   And you told the jury that it was possible to, um,

6    obtain a single file from a host computer?

7    A.   Correct.

8    Q.   Where you could download a kind of file from the

9    host computer, is that right?

10             MS. PARUTI:  Objection.

11   A.   Correct.

12             MR. CARNEY:  That's my last question leading

13   up to today's testimony.

14             THE COURT:  Yeah, well it is both leading, and

15   it may be leading up to today, so I'll let the answer

16   stand.  And now briefly go from there.

17   Q.   Could you repeat your answer?

18   A.   Correct, you can download one file or multiple

19   files.

20   Q.   All right.  Mr. Levin, did you ever employ "drive

21   sweeping" or "disk sweeping"?

22   A.   I have.

23   Q.   Would you explain to the jury please what "drive

24   sweeping" is?

25             MS. PARUTI:  Objection.

```
1              THE COURT:  Sustained.  We've been over this.
2              MR. CARNEY:  We went over this on Friday?  I
3    mean on --
4              THE COURT:  Yes, on the last day of sitting we
5    went over it, and he testified.  And he testified, just
6    so we're clear and I'm clear, you testified to occasions
7    where when someone had made their drive available, in
8    fact you swept a drive, is that right?
9              THE WITNESS:  That's correct.
10             THE COURT:  So you've done that?
11             THE WITNESS:  Yes, sir.
12             THE COURT:  About how many times?
13             THE WITNESS:  Um, multiple times.  I couldn't
14   give you the exact number, but many times.
15             THE COURT:  All right.
16        Go from there.
17             MR. CARNEY:  Thank you.
18   Q.  Were you using the drive sweep in 2011?
19   A.  Yes.
20   Q.  Had you been using it before then?
21   A.  Yes.
22   Q.  And when did you stop doing drive sweep?
23   A.  Probably in 2012.
24   Q.  Why did you stop?
25   A.  Um, using peer-to-peer file-sharing software became
```

1    irrelevant, most of the material is now available on the

2    internet.

3    Q.   What material are you specifically referring to?

4    A.   Concert footage -- most of the concert footage.

5    Also crypto-currency mining software.

6    Q.   What is crypto-currency mining software?

7    A.   It's the software that generates, um -- probably

8    everybody heard of Bitcoin.  Bitcoin is a type of

9    crypto-currency.  So that's what it is.

10   Q.   Is Bitcoin accepted at any stores that you know of

11   today?

12            MS. PARUTI:  Objection.

13            THE COURT:  Sustained.  Sustained.  Let's

14   focus on this case.

15       It's perfectly appropriate for you to inquire that

16   he used to obtain such data, but whether it's accepted

17   or you can invest in it, or things like that, we're not

18   going there.

19   Q.   In 2011, was Bitcoin legal?

20   A.   Yes.

21            MS. PARUTI:  Objection.

22            THE COURT:  Well, we'll let that stand.

23   Q.   Now you've indicated that you stopped using

24   Frostwire in about 2012?

25   A.   Correct.

1  Q.  Do you know what, um, a "wild card" is?

2  A.  Yes.

3            MS. PARUTI:  Objection.

4            THE COURT:  How do you know?

5            THE WITNESS:  (Silence.)

6            THE COURT:  How do you know?

7            THE WITNESS:  Well it's a widely-used term.

8  Technology basically allows you to enter a part of a

9  search string and everything within that search string

10  that matches will come out.  That's called a "wild

11  card."

12            THE COURT:  All right.

13       Go ahead.

14  Q.  How is that different from a "drive sweep"?

15            MS. PARUTI:  Objection.

16            THE COURT:  Well he's just told us.

17  A.  So a "drive sweep" --

18            THE COURT:  No, I'm going to sustain that

19  objection.

20            THE WITNESS:  Oh, sorry.

21            THE COURT:  You just told us that was

22  different, didn't you?

23            THE WITNESS:  Yes.

24            THE COURT:  Yeah.  All right.

25  Q.  At any time, Mr. Levin, did you knowingly possess

1    the 13 child-porn videos and photographs in this case?

2    A.  No.

3    Q.  Did you ever know it was on your hard drive?

4    A.  I did not.

5                MR. CARNEY:  Thank you.  That's all I have,

6    your Honor.

7                THE COURT:  Do you wish to examine?  Proceed?

8                MS. PARUTI:  Yes, your Honor.  Thank you.

9

10   CROSS-EXAMINATION BY MS. PARUTI:

11   Q.  Good morning, Mr. Levin.

12   A.  Good morning.

13   Q.  Can you hear me?

14   A.  Yes.

15   Q.  All right.  So you said that you used peer-to-peer

16   software from the late 2000s to the early like 20-teens

17   or so?

18   A.  Correct.

19   Q.  So you're saying now 2012 is when you stopped using

20   file-sharing software?

21   A.  Yes.

22   Q.  Because at that point that's when you started to

23   find things that you wanted in other sources, correct?

24   A.  Correct.

25   Q.  For example, the internet, correct?

1    A.  Correct.  "Archive.net," that's for most of the

2    concert footage.

3    Q.  Okay, so you could use the internet to find the

4    stuff that you previously had to go to other users who

5    had private collections, correct?

6    A.  Correct.

7    Q.  All right.  And that's what -- that's why you used

8    the peer-to-peer software, correct, to get things that

9    other people have that you do not have on your own

10   computer, correct?

11   A.  Yes.

12   Q.  All right.  You said that you used Shiraza and

13   Frostwire.  What other peer-to-peer file-sharing

14   programs did you use?

15   A.  I probably started from the original Napster.  I

16   used Minera.  I used Bit Torrent, like Torn -- Torn

17   Gods.  I used multiple file-sharing, um, things.

18   Q.  Okay.  And Napster, you said was the original.  That

19   started earlier than the 2000s, correct?

20   A.  Right.

21   Q.  That started in the '90s?

22   A.  Probably, yes.

23   Q.  So it's fair to say that you actually had been using

24   it for a little longer than the late 2000s, correct,

25   when you started with Napster?

1   A.   Correct.   But I really started using it a lot in the

2   late 2000s, early 2019.

3   Q.   Okay.   And in the late 2000s, that's when you had

4   the computer we've been talking about in court for the

5   past week or so, um, you got that computer in 2009,

6   correct?

7   A.   Yes.

8   Q.   And you bought that new and you installed Windows in

9   December of 2009, correct?

10  A.   I bought it new and Windows was already installed on

11  it.

12  Q.   Okay.   And nobody else used it but you, right?

13  A.   Correct.

14  Q.   And you used that for personal things, right?

15  A.   Yes.

16  Q.   And, um, did you use that for your work as well or

17  did you have a dedicated work computer?

18  A.   I used it marginally for work, mostly to keep my

19  CDs, home movies, my resumes, things like that.   But

20  occasionally for work.   But typically I would use

21  dedicated work computers for work.

22  Q.   Okay.   So you kept that computer, that HP laptop at

23  your home and you used that at home, correct?

24  A.   Correct.

25  Q.   And in fact you had a docking station on your desk,

1  correct, when the FBI came in 2015?

2  A.  I think so, yes.

3         MS. PARUTI:  And actually can we, um, show

4  exhibit -- yes, Exhibit 10, please.

5         (On screen.)

6  Q.  So the laptop we've been talking about, I'm circling

7  the one under the desk, that was your older laptop,

8  correct?

9  A.  Yes.

10 Q.  And there was one -- when the FBI agent executed the

11 search warrant at your house on August 12th of 2015, you

12 had your newer or your current laptop on the desk,

13 correct?

14 A.  Correct.

15 Q.  And that's what I've just circled in red on the

16 screen?

17 A.  Yes.

18 Q.  And that -- on the day of the search when they took

19 those pictures, it was actually in that docking station

20 so you could use a bigger screen, is that correct?

21 A.  It was either a docking station or a cooling pad.

22 Q.  So it was a cooling pad and it was hooked up to a

23 bigger screen, so that you could use the bigger screen

24 while you used your laptop?

25 A.  Correct.  The laptop itself was hooked up to the --

1    that's not a docking station, it's just a cooling fan.

2    Q.  Right, but the point is that you're using this

3    bigger screen, correct, and then this keyboard to access

4    the data in that laptop, correct?

5    A.  Correct.

6    Q.  All right.  Now, when you used your older laptop,

7    did you also use it in that manner?

8    A.  For the most part, yes.

9    Q.  Okay.  And it was also portable, right, so did you

10   ever bring it with you to places?

11   A.  Um, if I traveled -- yeah, usually I traveled with

12   my work computer, so rarely.

13   Q.  Okay, so it was under your control in your home and

14   you said you were the only one who used it, is that

15   correct?

16   A.  Correct.

17   Q.  All right.  Now, you said that when you were using

18   those different peer-to-peer file-sharing programs, they

19   all worked in similar ways, correct?

20   A.  Correct.

21   Q.  All right, meaning that you can -- if you want

22   something, for example like a Grateful Dead song, you

23   can type in, into the file-sharing program that's on

24   your computer, type in "Grateful Dead," right?

25   A.  Correct.

1   Q.   And that might return thousands of Grateful Dead

2   songs?

3   A.   That's correct.

4   Q.   Or Grateful Dead videos?

5   A.   Uh-huh.

6   Q.   Or any other type of file that has Grateful Dead in

7   it, correct?

8   A.   That's correct.

9   Q.   And if you wanted to, you could select every single

10  one of those results to download to your computer

11  through that peer-to-peer file-sharing software,

12  correct?

13  A.   If I wanted to.

14  Q.   Or you could take that time, when you had them sort

15  of filtered there, and you could go through and say,

16  "Oh, you know what?  I already have that fifth song, so

17  I don't want to waste time downloading that, I'm just

18  going to take Number 1, Number 20, and Number 50,"

19  correct?

20  A.   I could either do that or I can look at the user who

21  was making those files available, and if I know that

22  that user could download material that I select, I could

23  select everything from there and sweep the whole drive.

24  Q.   Because you know that person, you have familiarity

25  with downloading from that particular user on the

1   network, correct?

2   A.  Correct.

3   Q.  And you know how to navigate the peer-to-peer file-

4   sharing software, right, because you've been using it

5   for years, and you have, to be honest, advanced sort of

6   technical expertise, correct?

7   A.  Correct.

8   Q.  And it doesn't take a software engineer to use this

9   peer-to-peer file-sharing, correct?

10  A.  Yeah, it's not difficult.

11  Q.  It tells you it has an interface, or something that

12  the user is looking at, and it makes it easier for

13  people to use to understand what it is and how to use

14  it, correct?

15  A.  Yes.

16  Q.  All right.  Now, um, you said that you used that

17  computer for some work-related stuff, and one of those

18  things you mentioned was your resumes, and that's

19  something you had actually been working on for years,

20  correct?

21  A.  Correct.

22  Q.  And with each job that you went to or were applying

23  for as an independent contractor, you would update your

24  experience and you would put your experience in your

25  resume so that you could advertise yourself potentially

1    to employers, correct?

2    A.  Correct.

3    Q.  And you made your living in the past, I think you

4    said more than 20 years maybe, in some field of either

5    technology or information technology or some sort of

6    software-related, computer-related expertise, correct?

7    A.  Correct.  Technology for the most part.

8    Q.  Technology for the most part.  Okay.

9           You were talking about the "wild card," and just

10   so we're clear about that, you said you could put a wild

11   card in so that you could just look for a portion of a

12   word and it would bring up other types of files or

13   documents or whatever that included that, correct?

14   A.  Correct.

15   Q.  Is that usually denoted by like a star or an

16   asterisk?

17   A.  Correct.

18   Q.  Okay.

19           THE COURT:  I guess I then didn't understand

20   your earlier answer and maybe Ms. Paruti did.

21           Is that what you put in for a wild card, a portion

22   of a word?

23           THE WITNESS:  A portion of the word followed

24   by a, um, wild card or an asterisk.

25           THE COURT:  Okay.

1           Go ahead.

2                 MS. PARUTI:  So if we could just have Exhibit

3      26 up, please.  (On screen.)  And we'll look at Page --

4      Page 9, please.  (On screen.)  Okay, highlight 48,

5      please.  (Highlighted.)  Okay.

6      Q.  So do you see what's on the screen there, sir?

7      A.  I do.

8      Q.  Okay.  And do you see that asterisk and then it says

9      ".wmv"?

10     A.  Yes.

11     Q.  Okay.  Is that, if you were using a wild card to

12     search, is that what you mean you would do, the asterisk

13     and then whatever portion of the file name or properties

14     that you wanted to show up?

15     A.  It is, though typically that's not how I would use

16     the wild card.

17     Q.  But that's how you could do it, correct?

18     A.  Yes.

19     Q.  And that's what it really means, the asterisk means

20     anything else that comes before that is attached,

21     correct?

22     A.  Yes.

23                 MS. PARUTI:  Please clear that, please.

24                 (Screen cleared.)

25     Q.  Now when you do a "drive sweep" of somebody else's

1    drive, they have to enable that, correct?

2    A.   Correct.

3    Q.   All right.   So if you wanted to give other people

4    access to your files, when you're using file-sharing

5    software, you can choose only things in a specific

6    folder, correct?

7    A.   Correct.

8    Q.   So, for example, you could say "I want to share

9    anything in my pictures folder," correct?

10   A.   Correct.

11   Q.   And you tell the program "only give people access to

12   that," right?

13   A.   Correct.

14   Q.   Or you could say, "I want to give people access to

15   my entire computer," and the file-sharing software would

16   allow that, correct?

17   A.   Yes.

18   Q.   Okay.   And now by doing that, you're giving access

19   to literally anything that's on there, correct?

20   A.   A user can do that.   I never shared anything on my

21   computer.

22   Q.   Oh, you never shared anything on your computer,

23   right?

24   A.   What I was using, it was purely anonymous, and I

25   didn't even register to sharing anything.

1  Q.  Okay, so that means that you could get access to

2  other people's things, but they couldn't get access to

3  your things?

4  A.  That's correct.

5  Q.  All right.  Now, you would agree with me, wouldn't

6  you, that if you were doing a drive sweep of somebody --

7  well actually just look at this.

8       Can you tell how big their drive is when you

9  decide to do a drive sweep of somebody else's drive?

10 A.  Um, no.

11 Q.  You can't.  So you're just kind of guessing it could

12 be somebody with a terabyte-sized drive?

13 A.  It could be as little as a dozen files, it could be

14 as many as hundreds of thousands of files.

15 Q.  Okay.  And so you don't know that when you click --

16 when you tell the software to do the drive sweep,

17 correct?

18 A.  No, I don't believe there was an indication of the

19 size of their drive.

20 Q.  Okay.  So when you choose to do that -- when you

21 chose to do that, you would have no idea whether it was

22 going to take 10 minutes to download the stuff you

23 needed or two days, correct?

24 A.  That is correct.

25 Q.  Because you would agree with me, wouldn't you, that

1    for a smaller number of files, it would take much less

2    time than to download a drive that was as large as, for

3    example, your computer's hard drive, correct?

4    A.   That's correct.

5    Q.   And then when you would do a drive sweep, you'd

6    still then afterwards -- afterwards, excuse me, you

7    would have to go through your entire hard drive and find

8    the things that you wanted, correct?

9    A.   I would go to the folder that I designated,

10   typically that I designated for the drive to come down

11   to and then I would look for what I needed.

12   Q.   Okay.  And you can do that by searching your own

13   computer, correct?

14   A.   That's correct.

15   Q.   And you can actually go through and you can look at

16   the folder and click to open any subfolders that

17   downloaded, correct?

18   A.   You could do that, correct.

19   Q.   Or you could just do a search and type in the words

20   that you know of, correct?

21   A.   Correct.

22   Q.   And because you know, if you're typing in a word

23   into your Windows search function, that Windows will do

24   that searching for you rather than you having to

25   manually do it and go through it, correct?

```
1   A.   That's correct.
2   Q.   And then you said that you would delete everything
3   else that you didn't want?
4   A.   Not very often.  When I get to it, occasionally, I
5   would.  But I wasn't very meticulous about it.
6   Q.   Okay.
7   A.   Should I have been?  Yes.
8   Q.   Okay.  So you would download -- how often would you
9   say you would drive sweep?
10  A.   I mean I couldn't tell you the exact number, but
11  once -- once a week.  And I'm approximating it.
12  Q.   So once a week you're drive sweeping and you told us
13  the other day that 99 percent of the stuff that you
14  actually wanted or were looking for was Grateful Dead
15  music, correct?
16  A.   90 percent.
17  Q.   90?
18  A.   Yes.
19  Q.   Okay.  And all the rest you were looking for was
20  music?
21  A.   The rest were either movies or crypto-currency
22  mining software.
23  Q.   Okay.  And you would drive sweep people's drives who
24  you knew had good collections of that stuff, correct?
25  A.   From prior experience, yes.
```

1   Q.   Okay.  But you would do that once a week and you

2   would drive sweep the same people or you would find new

3   users who also had collections that you were interested

4   in?

5   A.   It would typically be either new users or users that

6   I would see it's the users that I've done before, and

7   use that.

8   Q.   (Pause.)  And you said you stopped using the peer-

9   to-peer software in 2012?

10  A.   Yes.

11              MS. PARUTI:  No further questions.

12              THE COURT:  Anything further for this witness?

13              MR. CARNEY:  Please, your Honor.

14

15  REDIRECT EXAMINATION BY MR. CARNEY:

16  Q.   Mr. Levin, I just want to ask you about wild cards.

17       You stated, in answer to the prosecutor's

18  question, that using an asterisk is one way to use wild

19  cards, is that right?

20  A.   That's correct.

21              MR. CARNEY:  Now could we see, your Honor,

22  Exhibit -- Exhibit 26, Page 9, highlighted on Item 48,

23  please.  (On screen.)  Thank you.

24  Q.   The prosecutor used this as an example of a wild

25  card.  Do you remember that?

1    A.   Yes.

2    Q.   And, um, to your knowledge and experience, is that

3    the only way to put in a wild card?

4              MS. PARUTI:  Objection.

5              THE COURT:  No.  Well I'm going to sustain

6    that particular question, but I'll ask, is that one way

7    to put in a wild card?

8              THE WITNESS:  It's one of many ways to use a

9    wild card.

10             THE COURT:  Okay, that's my question.  Now you

11   ask yours, Mr. Carney.

12   Q.   How do you do it, if you want to do a wild card

13   sweep?

14   A.   What I would typically do is type in "HDGD" --

15   standing for "High-Definition Grateful Dead," and then

16   "wild card" or the date I was looking for.  But I would

17   typically start the wild card, it would be after a

18   string of characters.

19   Q.   Thank you.

20             MR. CARNEY:  That's all I have, your Honor.

21             THE COURT:  Nothing further for this witness,

22   Ms. Paruti?

23             MS. PARUTI:  No.

24             THE COURT:  All right.

25        Does the defense rest or do you want to recall the

1    witness who --

2              MR. CARNEY:  I want to recall the witness,

3    your Honor.

4              THE COURT:  You may step down, sir.  And he

5    may be called for the purpose we discussed.

6    Mr. Nicholls.

7              MR. CARNEY:  And he may be sitting outside,

8    your Honor.

9              THE COURT:  Yes.

10             (Mr. Nicholls enters.)

11             (Witness recalled.)

12             THE CLERK:  I'd like to remind you, sir, that

13   you are still under oath.  Do you understand?

14             THE WITNESS:  Yes, I do.

15             THE CLERK:  All right, you may be seated.

16             THE COURT:  Mr. Carney.

17             MR. CARNEY:  Thank you.

18

19             * * * * * * * * * * * * * * *

20             JOSEPH NICHOLLS

21             * * * * * * * * * * * * * * *

22

23   DIRECT EXAMINATION BY MR. CARNEY:  (Recalls witness.)

24   Q.  Would you reintroduce yourself to the jurors,

25   please.

1    A.   Joseph Nicholls.

2    Q.   And you testified in this case last week?

3    A.   I did.

4    Q.   I wanted to ask you about one other area.

5         Are you familiar with the phrases "drive sweep" or

6    "disk sweep"?

7    A.   I am.

8    Q.   What do they refer to?

9              MS. PARUTI:  Objection.

10             THE COURT:  Overruled.

11   A.   They refer to going through a -- the formal name is

12   "hard disk drive," and it gets abbreviated "hard drive"

13   or "hard disk" and so on, but it's going through one of

14   those storage devices and looking at every file on that

15   storage device.

16   Q.   Whose storage device, in your example, are you

17   looking at?

18             MS. PARUTI:  Objection.

19             THE COURT:  No, he's just giving us an example

20   of how computers work and he may do so.  But I'm not

21   sure I understand that question.

22        Do you understand it?

23             THE WITNESS:  I understand where it's going.

24   There's a little bit more.

25             THE COURT:  All right, if you can answer it,

```
1    tell us, if you're going to do one, whose computer, not
2    particularly, but what computer you're looking at?
3                THE WITNESS:  Yes.
4    A.  For what's relevant to this case, it has to do with
5    peer-to-peer sharing and, um, when we say "drive
6    sweeping" or "disk sweeping," we're talking about a
7    user, let's called it Computer 1, that wants to receive
8    data from a remote computer called -- let's call it
9    Computer 2.  And so the person sitting at Computer 1
10   that wants to receive the files, that person is doing
11   the "disk sweeping."  The disk that is being swept is on
12   Computer 2, the computer that is sharing the data.
13   Q.  What does a "disk sweep" capture on the other
14   person's computer, on Computer 2?
15               MS. PARUTI:  Objection.
16               THE COURT:  Overruled.
17   A.  The "disk sweep" would be all the files that are on
18   Computer 2, the computer that's sharing, all the files
19   come down to the computer that is requesting the data,
20   Computer 1 in this example.
21   Q.  Can a person sweep an entire hard drive of the
22   Computer 2?
23   A.  The sweeping depends on what the Computer 2 user set
24   up and allowed to be shared, and there are various ways
25   to do that.
```

1             THE COURT:  So that I can follow it, the user

2     of Computer 2 sets the parameters?

3             THE WITNESS:  Yes.

4             THE COURT:  And sets what's permitted to be

5     swept?

6             THE WITNESS:  That's correct.

7             THE COURT:  Within those parameters, under a

8     peer-to-peer file-sharing program, the user of Computer

9     1 can "sweep" or download all those files?

10            THE WITNESS:  Correct.

11            THE COURT:  All right.

12     Q.  Are you aware of instances where a person, we'll

13     call him Computer 2, makes available his entire hard

14     drive or her entire hard drive?

15            MS. PARUTI:  Objection, your Honor.

16            THE COURT:  Sustained to that question.

17     Q.  Are you aware of instances where a person allows his

18     entire hard drive to be swept?

19            MS. PARUTI:  Objection.

20            THE COURT:  No, sustained.  I've permitted him

21     to testify that it apparently can be done, um, but I

22     don't know if he can give us such instances, and even if

23     he can, I don't know why they're relevant, so.

24            MR. CARNEY:  Your Honor, I submit that this

25     evidence is relevant because it will show --

```
 1              THE COURT:  No, don't argue.

 2              MR. CARNEY:  Can I make an offer of proof?

 3              THE COURT:  You may.

 4

 5              AT THE SIDEBAR

 6              THE COURT:  Go ahead.

 7              MR. CARNEY:  Your Honor, if the witness were

 8  allowed to answer, I would expect he would say the

 9  following.  He's very familiar with instances of a

10  person allowing his entire hard drive to be swept by

11  someone else.  I submit that that evidence is relevant

12  because that's what my client said he did, shared --

13  downloaded entire hard drives.  It's admissible because

14  my --

15              THE COURT:  Yes.

16              MR. CARNEY:  Because the person is an expert

17  and can testify, with his expertise, about whether he

18  knows that people will sometimes make their entire hard

19  drive available.

20              THE COURT:  I don't --

21       Do you object?

22              MS. PARUTI:  Yes, I do.

23              THE COURT:  Sustained.

24       All right.  Now while we're here, this is going

25  smoothly, you're about done with him, right?
```

```
 1              MR. CARNEY:  Yes, your Honor.
 2              THE COURT:  Then you'll rest, that's it?
 3              MR. CARNEY:  Yes.
 4              THE COURT:  That's fine.
 5
 6              (In open court.)
 7              THE COURT:  In view of my ruling, anything
 8    else?
 9              MR. CARNEY:  Yes.  May I have a moment, your
10    Honor?
11              THE COURT:  You may.
12              (Pause.)
13    Q.  Mr. Nicholls, can you explain what, quote, "user
14    access," end quote, means related to the accessed
15    section of files?
16              MS. PARUTI:  Objection.
17              THE COURT:  No, that goes beyond what I said
18    he could be recalled for.  Sustained.
19              MR. CARNEY:  May I approach, please, your
20    Honor?
21              THE COURT:  No, I don't think so.
22         Anything else?
23              MR. CARNEY:  I'm trying to ask this expert the
24    questions that the jury asked.
25              MS. PARUTI:  Objection.
```

1          THE COURT:  Well whatever you're trying to do,
2    I said he could be recalled for a specific reason, and
3    now he's gone over that reason.  That's my ruling.
4    Q.  Mr. Nicholls, if you open and delete a file, would
5    there still be a link file created?
6          MS. PARUTI:  Objection.
7          THE COURT:  No, sustained.  But I see what
8    you're doing here and, um -- (Pause.)  And I think I'm
9    going to allow it.  But you'll allow me to put the juror
10   questions.  So we'll go back.
11        As one of the jurors inquired, since we have you
12   now on the stand, sir, can you explain user access
13   related to the accessed sections of files?
14        THE WITNESS:  Um, the access that we've just
15   talked about are the dates that a file was used, and as
16   we talked about the last time, you know sometimes the
17   file can be used and displayed on the screen, and for a
18   convenience we'll say it opens the file and the human
19   sitting there can see what's on the screen.  But at
20   other times, as we talked about indexing, for example,
21   the file is used and, um -- but it's only the computer,
22   a human can't see what was in the files when it's used
23   that way.  Now both of those will cause the last
24   accessed date to be updated on this computer.
25        THE COURT:  Can a file be accessed and not

1   opened?  I think you've just answered that?

2              THE WITNESS:  Yes.

3              THE COURT:  And your answer is "Yes"?

4              THE WITNESS:  The answer is "Yes."

5              THE COURT:  I see.

6              THE WITNESS:  Where we say "open" means that

7   the user sees it on the screen.

8              (Pause.)

9              THE COURT:  All right.  Now I've asked those

10  questions, but, um, you may follow up.

11             MR. CARNEY:  Thank you.

12  Q.  When is a link file created?

13             MS. PARUTI:  Objection.

14             THE COURT:  Overruled.  He may have it.

15  A.  There's many reasons a link file gets created, but

16  one of the reasons is that the user opened it and it's

17  displayed on the screen and a link file is saved on the

18  computer for convenience.

19  Q.  If you open and delete a file, will there still be a

20  link file created?

21  A.  Yes, that the link file gets created when the file

22  is open.  What happens after that, the link file doesn't

23  get involved in.

24  Q.  Can a file be created on the server, given an access

25  time date, and not or never be opened?

1           MS. PARUTI:  Objection.

2           THE COURT:  Do you understand that question?

3           THE WITNESS:  I don't, and the use of the term

4    "server" in this context.

5           THE COURT:  All right, then I'm going to

6    sustain the objection.

7           MR. CARNEY:  All right.

8    Q.  If a file is downloaded to a computer, can it never

9    be opened by a user?

10          MS. PARUTI:  Objection.

11          THE COURT:  No, now we're sufficiently beyond.

12    You're sustained.

13          MR. CARNEY:  Your Honor, may I direct your

14    attention to the final question on Page 1 of the jurors

15    questions.

16          MS. PARUTI:  I renew my objection, your Honor.

17          THE COURT:  I understand, and I'm standing on

18    my ruling.  Sustained.

19       Anything further for this witness?

20          MR. CARNEY:  (Pause.)

21    Q.  Now, Mr. Nicholls, can you explain how Bitcoin was

22    used in regards to peer-to-peer sharing?

23          MS. PARUTI:  Objection.

24          THE COURT:  No, no, sustained.

25       Look, I understand the jurors asked that question,

1    but I ruled that's irrelevant.  Sustained.

2    Q.  All right, Mr. Nicholls, thank you for your

3    testimony.

4              THE COURT:  Anything for this witness,

5    Ms. Paruti?

6              MS. PARUTI:  Just very briefly, your Honor.

7              THE COURT:  All right, you may.

8

9    CROSS-EXAMINATION BY MS. PARUTI:

10   Q.  Mr. Nicholls, you said -- you told us the last time

11   and you told us again here today, that a link file is

12   created when a user opens a file, correct?

13   A.  Correct.

14   Q.  That link file is a shortcut to the target file,

15   correct?

16   A.  Correct.

17   Q.  So when we say "open," we mean it's up on the screen

18   and the user can see it, correct?

19   A.  Correct.

20   Q.  Okay.  And you said the link file tells us nothing

21   about what happened to that target file after it leaves

22   the computer, correct?

23   A.  (Pause.)  "Leaves the computer," meaning?

24   Q.  So it could be deleted, right?

25   A.  Yes.

1   Q.  Or it could be transferred to a thumb drive,

2   correct?

3   A.  Which is really a delete, yes.

4   Q.  So we use the term "delete" just to mean we're

5   taking it off of one place and this one place is this

6   defendant's computer, correct?

7   A.  Yes.

8   Q.  Thank you.

9           MS. PARUTI:  Nothing further.

10          THE COURT:  Nothing further for this witness,

11  Mr. Carney?

12          MR. CARNEY:  Correct, your Honor.

13          THE COURT:  You may step down.

14      Does the defense rest?

15          MR. CARNEY:  Yes, the defense rests, your

16  Honor.

17          THE COURT:  You may step down.  Thank you.

18      All right, ladies and gentlemen, now you have

19  heard all the evidence you're going to have in this case

20  and we appear to be on track.  We're going to take a

21  15-minute recess now, I need to talk to the lawyers

22  about legal matters.

23      There are two most important parts of the case

24  that remain.  The lawyers will sum up the evidence that

25  you've heard and I will explain in detail the law that

1  you must follow.  These are important parts of the case,

2  so you should not now, and do not, start talking about

3  the case.  Still, though you've now heard all the

4  evidence, keep your minds suspended, do not discuss the

5  case either among yourselves, nor with anyone else.  You

6  may stand in recess for 15 minutes.  The jury may

7  recess.

8            THE CLERK:  All rise for the jury.

9            (Jury leaves, 10:10 a.m.)

10            THE COURT:  You have a motion, Mr. Carney?

11            MR. CARNEY:  Yes, I do, your Honor.  I move

12  for a directed verdict of not guilty.

13            THE COURT:  The motion is denied, but your

14  rights are saved, and the matter may be renewed

15  following the verdict.

16        Has Ms. Gaudet given you copies of the verdict

17  slip, it's very simple.

18            MR. CARNEY:  Yes, your Honor.

19            THE COURT:  And here's how I propose to

20  charge.  And in essence we're going to give the jury

21  copies of this verdict slip.  And I'm going to go over

22  now, as I reflect on it, the four elements.

23        Well before I do that, um, you know -- well

24  Ms. Paruti, I don't think, has heard me charge, but the

25  general charge is always the same.  I start with

1    recalling the jury to their duty, focus them on the

2    evidence.  I tell them that I am not the source of

3    evidence.  I tell them they must follow my charge.

4         I talk about the various sources of evidence in a

5    case.  In this case the sources of evidence are, as I

6    see it, four-fold.  There's a stipulation as to, um, in

7    the interstate commerce aspect.  There's the judicial

8    admission in the defendant's opening.  There is the oral

9    evidence and there is the -- or rather the testimonial

10   evidence.  And there is the evidence of, um, the various

11   exhibits.  I go over each one of those.

12        I do not call the witness "experts," though you

13   may.  In my charge I say that certain witnesses, by

14   background, training, and experiences, are allowed to

15   give their opinions about certain things that's happened

16   in this case.  I say that they may accept those

17   opinions, but of course they may reject them, and they

18   should look at the basis of those opinions.

19        I give sort of a stock charge on how they evaluate

20   the testimony of witnesses.  I explain they may draw

21   reasonable inferences, but may not guess or speculate.

22   I do not define "reasonable doubt," but I mention it

23   emphatically.

24        At this stage I tell them that I'm going to make

25   mention of a couple of things that are not evidence and

```
 1      I will compliment you all, and it's a sincere
 2      compliment, by the way you have tried the case.  Then I
 3      tell them to disregard it, because you were not there
 4      and you, as lawyers, do not know.
 5             Likewise I tell them to disregard anything they
 6      may think about how I have managed or presided over the
 7      case and I tell them I have no view about how the case
 8      will come out, which is entirely the case.
 9             Then we get to the guts of it, and I think there
10      are four elements, and I'm going to refer them to the
11      verdict slip, and I'm going to make mention of the
12      elements in reverse order.
13             The interstate commerce element is stipulated and
14      the stipulation is an exhibit and the exhibit number is
15      what?  Can anyone tell me?
16                 (Pause.)
17                 MS. PARUTI:  16.
18                 THE COURT:  Thank you.  Then I will say that
19      that's stipulated and make mention as to what a
20      stipulation is.
21             Child pornography.  I will say it was admitted
22      that certain files, um, are -- are in fact child
23      pornography, and those are exhibits what?
24                 MS. PARUTI:  Exhibit 17, um, has -- is a disk
25      that contains 13 files of child pornography.
```

1           THE COURT:  And those files are it.  All

2    right.  Fine.

3           And then I will say -- and I will again, despite

4    the judicial admission in the opening, which I will tell

5    the jury they certainly can accept, I think it's the

6    better part of valor to go over the statutory definition

7    of child pornography and I will do it as I did in my

8    precharge.

9           Then I will say "Well of course he's got to

10   possess the child pornography," and that's not admitted,

11   and you must look -- I will tell the jury that they can,

12   but are not required to, find the possession of the

13   child pornography, by its existence, on a computer used

14   and apparently only used by Mr. Levin.  And then I will

15   back up to "knowingly" and say that this is completely

16   disputed and it largely depends upon what you believe

17   from the evidence.  I don't intend to go into it.

18          The defense has made a request for a specific

19   charge, um, I will not give it, but at the same time I

20   don't expect the government to make any mention of that

21   thumb drive or to suggest there are other instances,

22   what's in evidence is in evidence.

23          Let's see.  Saying I won't give it, Mr. Carney,

24   you'll be sure to renew it, because I will invite you to

25   the sidebar after the -- after I give the charge, and

1    that's the time to take objection to the charge and

2    renew any objection.

3          As for closings, each side gets a half an hour.  I

4    don't think you should take it, but that's the trial

5    practice advice, and you're welcome to it.  The rules

6    stipulate that the government goes first and then the

7    defense.  The government gets rebuttal.  Rebuttal,

8    Ms. Paruti, has to be real rebuttal, not a second

9    charge, and in my mind that's like 2 minutes of

10   stemwinding rhetoric, whatever it is you want to say,

11   but if you go beyond 2 minutes, it better be "He said

12   this, but remember that."  It's got to be absolute

13   rebuttal and I'll start crowding you if it isn't.

14         All right.  I think we ought to take a recess so

15   you can get ready for final argument.

16         Yes, Ms. Paruti, first.

17             MS. PARUTI:  I'm sorry, your Honor.

18         You, in your precharge, you also -- I just want to

19   draw your attention to the elements of the crime.  The

20   indictment charges an additional -- essentially an

21   enhancement in that it alleges that at least one of the

22   files shows a prepubescent child or a child under 12.  I

23   know that you mentioned that during your precharge, I

24   just want to make sure that you do that again during

25   this charge.

1              THE COURT:  I did mention it --

2              MS. PARUTI:  You did.

3              THE COURT:  -- but I thought the way we had

4    agreed -- is it a statutory enhancement, it has to be --

5              MS. PARUTI:  Statutory, yes, your Honor.

6              THE COURT:  Very well.

7              MS. PARUTI:  So it's pled in the indictment

8    and --

9              THE COURT:  I will mention it, that that is

10   something that has to be proved.  It's admitted, but it

11   has to be proved.

12        All right.

13             MS. PARUTI:  The other question I just wanted

14   to raise, which I raised briefly at sidebar, is that

15   obviously I did not know that there would be an

16   admission and I told -- to the fact that child

17   pornography was there and that it was child pornography,

18   and I advertised pretty extensively in a significant

19   amount of detail to the jury that they were going to see

20   this evidence, this is how they were going to do it.  I

21   just want to make sure that the Court --

22             THE COURT:  I'm going to say they'll have it,

23   they'll have the ability to view it, they may view it,

24   here are the requirements.  They're just to be aware

25   that there was that admission in the opening.

```
 1                   MS. PARUTI:  I just don't want them to hold it
 2         against me as if there was some adverse ruling.
 3                   THE COURT:  Actually I don't see how they can.
 4                   MS. PARUTI:  Okay.
 5                   THE COURT:  But you listen to the charge and
 6         if you think there's something more I could say, I'll be
 7         open to it.
 8                   MS. PARUTI:  The only other, um, request I
 9         wanted to make was about the limitations of the
10         defendant's closing.  I noticed in opening that he
11         referenced the defendant's criminal history, which I
12         would absolutely never expect Mr. Carney to do.  So I
13         don't expect him to knowingly go into information that's
14         not proper for closing, but given that it already
15         happened, I think it bears on --
16                   THE COURT:  He's not going to do it and I'll
17         be alert to it.
18             All right, Mr. Carney.
19                   MR. CARNEY:  I have one request, your Honor.
20                   THE COURT:  Yes.
21                   MR. CARNEY:  Will you be reading from the
22         patent jury instructions the definition of "knowingly"?
23         It reads "knowingly" --
24                   THE COURT:  Wait a minute.
25                   MR. CARNEY:  I can give it to you.
```

```
1                  THE COURT:  Actually if you have one --
2                  MR. CARNEY:  Yes, I have it.
3                  (Hands up.)
4                  THE COURT:  Yeah.  (Reads.)  Yes, I will so
5       charge.
6                  MR. CARNEY:  Thank you.
7                  THE COURT:  All right.  Let's recess till
8       10:30.  We'll start right at 10:30.  We'll recess.
9                  THE CLERK:  All rise.
10                 (Recess, 10:22 a.m.)
11                 (Resumed, 10:30 a.m.)
12                 THE COURT:  Come to the sidebar.
13
14                 AT THE SIDEBAR
15                 THE COURT:  (Reads.)  Well --
16                 MS. PARUTI:  My objection is to the last
17      three, only the last three, evidence of how he spoke
18      about the videos with anyone, that he showed anyone else
19      or that he sent them to anyone.  Those are -- there's no
20      evidence either way.  Mr. Carney didn't, or Mr. Gaudet,
21      didn't ask any law enforcement about that.
22          Secondly, and more importantly, it's irrelevant to
23      whether or not he possessed the material in question.
24      He would have been charged with an additional crime.
25                 THE COURT:  I understand he would have been
```

```
 1   charged.  Now it passes the relevance test, but the fact
 2   is that this is not part of the government's burden, so
 3   you may use them, but for the last three.
 4              MR. CARNEY:  May I be heard on that, your
 5   Honor?
 6              THE COURT:  Very briefly.
 7              MR. CARNEY:  What I'm trying to suggest is
 8   evidence that if it existed, it could have corroborated
 9   the government's case.
10              THE COURT:  No, but there is no burden on the
11   government to come up with that evidence.
12              MR. CARNEY:  I understand.
13              THE COURT:  It's not like a missing witness
14   thing.  And so you can't have it.  That's the Court's
15   ruling.
16              MR. CARNEY:  Can I argue that there were no --
17              THE COURT:  No, you cannot.  There's no
18   evidence either way.  We'll stick to what evidence there
19   is.  That's the ruling.
20
21              (In open court.)
22              THE COURT:  Now we've come to the point now
23   where we give the lawyers the chance to make their
24   closing arguments.  This is the attorney's chance to
25   stand before a jury of Americans and argue the client's
```

1    cause, and it's a vital part of the case.  So if the

2    arguments help you better understand the case, that's

3    what they're designed to do.  If the arguments persuade

4    you or create doubts in your mind, that's what they're

5    intended to do.  But just remember this.  The lawyers

6    weren't there, the lawyers themselves don't know.  The

7    lawyers must argue from the evidence that you have and

8    we all have seen and heard, that's what they're arguing

9    from.  So if the lawyer says something and your memory

10   of the evidence or your interpretation of the evidence

11   is different, your interpretation governs, not what a

12   lawyer says.

13        Now because it's the government here that bears

14   the burden of proof beyond a reasonable doubt, the

15   government gets a chance to make its argument first.

16        Ms. Paruti.

17          MS. PARUTI:  Thank you, your Honor.

18

19   CLOSING ARGUMENT BY MS. PARUTI:

20        When the FBI showed up at the defendant's

21   apartment on August 12th of 2015 to execute a search

22   warrant, that is how he, Alex Levin, the defendant,

23   described the extent of his computer knowledge and

24   expertise, "Average."  They told him they were

25   conducting an investigation into the internet and they

1    asked him what he used the internet for?  "E-mail."

2    This is coming from a person who described himself as a

3    "seasoned IT professional" who included "securing

4    corporate assets from cyber attacks" among his career

5    accomplishments and identified "overseeing the delivery

6    of large complex technology programs covering software

7    development and IT infrastructure" among his

8    professional experience.  "Average."

9         That was some of the first evidence you heard in

10   this trial we started just last week, words that came

11   directly from the defendant.  The question for you to

12   contemplate today is why would somebody with this type

13   of experience, the defendant, with his professional

14   experience, tell the FBI that he was just average?  You

15   don't need an advanced degree to know the answer to that

16   question, common sense tells you the answer.  You all

17   have it and you all will need to use it when you go back

18   there to deliberate.  Common sense tells you that he

19   said that because he had something to hide.

20        And as we learned over the course of this trial,

21   boy did Alex Levin have something to hide, in fact he

22   had 13 things to hide.  I'm talking about 12 videos and

23   1 picture of child pornography distributed among three

24   different folders in the hard drive of his computer, the

25   computer sitting right under his desk.

1          Let me be clear.  There is no dispute that the

2     defendant had child pornography on that computer.  There

3     is no dispute that it was his computer.  There is no

4     dispute that he was the only person who used that

5     computer.  Child pornography was in a folder -- well one

6     of the folders labeled "Incomplete," which was a

7     subfolder of one labeled "Shiraza," which we know is

8     peer-to-peer file-sharing software.  It was in another

9     folder named "Frostwire," which again we know is

10    associated with peer-to-peer file-sharing software.  And

11    it was in a third folder also named "Incomplete."  This

12    is not incidental, it's not accidental, this is not one

13    file that slipped through during a drive sweep of

14    somebody else's random files on their computer, this is

15    13 separate files in folders all associated with

16    downloading from the internet.

17         Now when you open Exhibit 17, which is the disk

18    that contains the child pornography that was found on

19    Alex Levin's computer, you will see these files, you

20    will see the titles as they're reproduced from the

21    exhibits you saw in court.  Some of these file names

22    leave nothing to the imagination, some of them have

23    titles that, as Mr. Nicholls conceded last week, looked

24    like they contained hash values, remember the digital

25    fingerprint of files that peer-to-peer file-sharing

1    software uses to identify files to share from one user

2    to another.  This, ladies and gentlemen, this child

3    pornography, is what Alex Levin had to hide when he told

4    the FBI, on August 12th, 2015, that his computer

5    knowledge and experience was average and that he used

6    the internet for e-mail.

7        We -- you, the finders of fact in this case, you

8    now know that back on that date, on August 12th of 2015,

9    those statements were not true, and you know that

10   because the evidence shows you that.  The defendant's HP

11   laptop computer contained evidence of way more technical

12   know-how and expertise, sophistication, and dexterity,

13   than he let on on that date.

14       The evidence shows you, for example, that he was

15   using TOR, and you heard that was the internet browser

16   and the network that allows online activity to be

17   anonymous and that facilitates access to the dark web.

18   You have heard, through Mr. Levin himself when he

19   testified to you from the witness stand, that he was

20   using the internet and products from the internet to

21   mine Bitcoin, virtual currency, some digital money

22   essentially, and that he even went so far as to buy a

23   server to do that, that's what that Attorney General

24   Office's complaint is, that you had asked about, that's

25   at Exhibit 36, and you'll be able to look at that and

1   you'll be able to read the words that were exported in a

2   document form from his computer when the FBI looked at

3   it.  The point is that this is no sort of tech-averse

4   dinosaur, this is a technology professional who is

5   trying to throw the FBI off his scent.

6        But now that the evidence of his criminal behavior

7   is here, in court, out in the open, right before you,

8   and will be back with you in the jury room, he has

9   tried, when he took the stand, to explain to you what it

10  is and to explain it away.  You do not need to accept

11  that explanation, and in fact if you look at the

12  evidence, that evidence tells you that you should not

13  accept that explanation, and your common sense tells you

14  that that explanation makes no sense.

15       The defendant would have you believe that in order

16  to find concert footage from other people on the

17  internet, he would download their entire hard drives

18  once a week for music, that he would use file-sharing

19  software, which in and of itself allows people -- the

20  very point of which is to allow people to pick what they

21  want to look for, to put in search terms for specific

22  songs or concert venues or dates of shows so that we can

23  narrow and filter their results before they take it from

24  somebody else, use space, and download it to their own

25  drives.  But instead of doing that, which is the point

of the software he was using and has been using for
years, he told you that he would connect to somebody who
had good music, which presumably he had already
obtained, and download every single thing on that
person's computer.  Again, common sense rules the day.

Why on earth would anybody ever go about looking
for something specific that they wanted in that very
broad and blind way?  The answer is they wouldn't.  It
does not make sense.  And you know that because you're
human beings who function in society.  Common sense
tells you that it is inconceivable that if you wanted a
Grateful Dead song and you have the ability to search
the entire pool of people working or sharing on the same
network as you, that you would take 10 steps backward
and just connect with the one person, close your eyes,
and hope that you got what you wanted from their drive.
It doesn't make sense.  It doesn't make sense from an
efficiency standpoint, it doesn't make sense from a
security standpoint, and it just doesn't make sense.
And most importantly, it doesn't make sense in the
context of the evidence in this case that you have
before you.

To be clear, the government does not need to prove
how all of the child pornography that was on the
defendant's computer got there, that's not part of the

1    government's burden, it does not -- it's also not your

2    job and the government does not need to prove to you why

3    he would even want it there in the first place, and you

4    shouldn't speculate about that.  This is about one

5    thing, one question, did he know that the child

6    pornography in those three different folders were in --

7    excuse me, was in those three different folders on his

8    hard drive and did he know that it was child

9    pornography?  And the evidence that you have -- not

10   speculation, the evidence that you have before you leads

11   to only one answer to that question, and that answer is

12   "Yes, of course he knew."  The defendant could not and

13   he cannot frankly explain away one crucial piece of the

14   evidence before you, the fact that he searched his

15   computer for the term "PTHC."

16        Now there's a lot of technical testimony here,

17   among just a few witnesses, and the character of the

18   testimony tends to be technical, but it's not

19   complicated.  Take a deep breath.  Take a step back.

20   And again hold onto your common sense.  And it's pretty

21   easy to navigate through it actually.

22        You have it in black and white.  Both Special

23   Agent Phelps and Mr. Nicholls agree that Windows 7,

24   which was the operating system of Mr. Levin's computer

25   that he had installed on his computer still in 2015,

1    stores the most-recently-opened items on the computer
2    and the most recent searches on the computer, you saw
3    evidence of those recently-opened files, link files, in
4    the computer itself.  Now remember a "link file" is
5    basically just a shortcut that the computer, Windows,
6    the system, generates to make it easier for a user, a
7    person who once opened the file, to open it again.  And
8    I want to be very clear, the defendant is not charged
9    with possessing these link files.  The fact that these
10   link files tell you about what was open on his computer
11   is relevant to his knowledge.
12             MR. CARNEY:  I have an objection to that, your
13   Honor.
14             THE COURT:  No, that's an appropriate
15   argument.  Go ahead.
16             MS. PARUTI:  For example, in Exhibit 24, which
17   you have before you now, you see, one, a video called
18   "Pedo Woman and Her Doggy," that was at one point
19   located in Alex's download folder, but at the time of
20   the search no longer existed on the computer.  In
21   Exhibit 25, you saw another video, this one called
22   "PTHC, Pretty Babysitter Makes Sex with 3 YO Little
23   Girl, PTRBR Subtitle Pedo Mom 2014."  That was located
24   in another folder on Alex Levin's hard drive.  Again,
25   that one no longer existed on the computer at the time

1    of the search.  You saw evidence of these and other link

2    files in that User Registry Report 2, and that's at

3    Exhibit 26.

4         When you go back to the jury room, you'll be able

5    to flip through the paper copy and you'll be able to

6    look at it as a group on the computer and go through the

7    pages to really look at all of the sections that the

8    witnesses highlighted for you on the stand.  Remember,

9    that this is the report that Agent Phelps generated,

10   using his computer, that shows you, in the first

11   section, what the computer recorded about items that the

12   user, a person, a human being, had opened.  Those items,

13   the "link files," as we've been calling them, are

14   ordered, they go in order.  And in the first category

15   you'll see that they're not broken down into specific

16   file types, we just know the title of the items that had

17   been opened, and we can see, in that first section, the

18   most 30-recently-opened items on the computer.

19        You know from the testimony that each of those

20   items is given a number, and that's highlighted here on

21   the screen for you now, on the left-hand side.  Do you

22   recall the agent's testimony, um, that when you see the

23   item numbers out of order, it means that they had been

24   opened more than once?  And so that when every time an

25   item is opened, it gets a number, it goes in order.  But

1   if you open the same thing twice, within the 30-most-

2   recent-files opened, it just gets moved up a line,

3   rather than giving it a new Number 7 or Number 10.

4        You can tell what some of those items are based on

5   their names and we looked at these through the

6   witnesses' testimony.  For example, we know that

7   "Downloads" and "Alex's Dots" are folders, because we

8   saw them -- you saw them in the evidence.  We know that

9   other link files, here in this section, have names that

10  are indicative of child pornography, like, for example,

11  the ones including the term "falco" or "pedo" in them.

12  We don't know what types of files they were, but we

13  know, from their inclusion here, that they were opened

14  by a person, which means it was up on his screen.

15  That's what Mr. Nicholls just told you.

16       Now the Registry Report, which is Exhibit 26, also

17  breaks down the most recently-user-opened files by type,

18  for example there are Word documents, like the

19  defendant's resume and bio, and you can go through and

20  you can look and see all of the recently-opened Word

21  documents in there.  Some of them again you know what

22  they are because you have them in evidence or you can

23  tell based on their title.

24       For example, we also have, in a separate section

25  of the report, video files, which you know are videos

because they have that file extension, the ".avi."  It's
worth noting here that even though Windows stores up to
10 avi files or movie files of that type, there are only
6 here.  If the user doesn't open more than 10, or more
than 6, for example, Windows doesn't store it, it's only
storing what has actually been opened.  In 4 of those 6
there are titles that obviously signal that they were
child pornography.  So where are the concert videos?

To be clear, the defendant is not charged again
with possessing these link files or their target files
that generated the shortcuts.  The fact that Mr. Levin
had opened them, however, is directly relevant, as I
said, to his knowledge that other videos still present
on the computer, when the FBI executed the search
warrant in 2015, were child pornography, and that he
knew they were child pornography.

Now much has been made about the term "Last
Accessed Date" for a lot of the files that we saw,
specifically the child pornography files, but one word
of caution, those dates, I submit, are nothing but a
distraction for you, they tell you nothing about what
you need to decide, what your job it is to decide.
Access dates tell you nothing about what happened to the
files prior to the last accessed date, which could be
because of a system process that was run or because, for

1     example, somebody opened it.  But it doesn't matter,

2     what matters is that the files were there and that

3     Mr. Levin knew that they were there.

4          The creation dates, however, for example in the

5     Shiraza folder the child pornography file had creation

6     dates of 9-24-11, so September 24th of 2011.  The

7     Frostwire files had creation dates of October 11th,

8     2011.  And the child pornography file in the incomplete

9     folder had creation dates of October 11th, 2011.  Those

10    dates are important because they tell you that those

11    files had existed on the defendant's computer since

12    2011, a computer which he bought new in 2009 and used up

13    through the beginning months of 2015.  For four years

14    prior to the FBI search warrant execution in August of

15    2015, those files were present on the defendant's

16    computer, which is significant when you think about what

17    his search history was.

18         Now I'm not talking about his search history using

19    the peer-to-peer file-sharing program, that's not in

20    evidence and you shouldn't speculate about what he was

21    actually searching for, I'm talking about the specific

22    searches that he conducted on his computer, and that's

23    also included in that Registry Report, which is Exhibit

24    26, it's called "Word Wheel Query," that's the section.

25    It's the section of the Registry Report that shows you,

1    in black and white, in print, what the defendant was

2    typing in to search for on his hard drive, the 69 most

3    recent searches, in fact, which includd, for example,

4    ".jpg, PTHC, incomplete, and Tara."  And we know that

5    "Tara," we learned from the witness that "Tara" is a

6    name that is frequently associated with child

7    pornography files.  We know that "jpeg," "jpg" denotes a

8    picture file.  And we know that "PTHC" stands for

9    "Preteen Hard Core."  It's undisputed in this trial.

10          Remember, when you're looking at the numbers,

11   again in this section and in all the sections in this

12   Registry Report, when you're looking at the numbers on

13   the left-hand column, if you see one that's out of

14   order, that's because it was a search that was performed

15   more than once within that 69 most recent searches.  In

16   addition to seeing the numbers at the left of each

17   entry, when you're looking at this exhibit, you can also

18   see the list sort of at the top, you can see it here on

19   this screen.  Note Items 32, 33, and 29, those are the

20   jpegs, the PTHC, and the incomplete searches, you can

21   see that they've all moved from their initial position

22   within that category.

23          Again, we're not talking about searches of the

24   internet, we're talking about searches of his computer

25   hard drive.  As Mr. Nicholls explained the other day by

1    way of example, if you want to define a file on your
2    computer with the word "elephant," you would literally
3    type out "elephant" into the search bar that appears
4    right as part of your desktop in Windows 7, and the
5    computer, once you input that term "elephant," would
6    search all of the contents and return results that were
7    responsive, so results that had "elephant" in them.
8    Here, obviously, the defendant was not searching for the
9    term "elephant."
10           One of the searches you just saw that he performed
11   was for the extension "jpg" and you see that asterisk
12   there, which Mr. Levin himself explained was one of the
13   ways that you could do a wild card search, where
14   anything that was appended to "jpg" would come up in
15   your search.  So knowing what we know about Mr. Levin's
16   computer, let's look at what would have come up when he
17   performed that search.
18           You're looking at the list that we have there of
19   all the child pornography files that were found on his
20   computer which are contained within Exhibit 17.  When
21   Alex Levin's typed "jpg" -- and we know it was him,
22   because he was the only user of that computer, he would
23   have seen this file, "2011 PTHC falco awesome 7 YO and 8
24   YO child porn 22."  It doesn't get much clearer than
25   that, it literally says "child porn" in the title.

1          Another of the most recent searches he performed

2     was for the term "incomplete," and that search, we know,

3     because we've seen what's on his hard drive, would have

4     brought him to the Shiraza folder and it would have

5     brought him to the incomplete folder.  That's where all

6     the child pornography was.  It would have brought him

7     directly to the child pornography.

8          Yet another term that he searched most recently on

9     his computer was for the term "PTHC," "Preteen Hard

10    Core."  When the defendant entered those letters into

11    his search bar on his computer, the computer would have

12    responded to his command by bringing him to 10 of the 13

13    files he is charged with possessing.

14         And that leaves us with one file that wouldn't

15    have come up just with those three search terms, one

16    file literally sandwiched there, among the rest, with a

17    title that speaks for itself, "incest pedophilia Lolita

18    rape dad daughter."

19         This is what it comes down to.  There is only one

20    reason why this defendant would search his own computer

21    for the acronyms that stand for "preteen hard core,"

22    there's one reason why, and that reason is to find child

23    pornography that he knew was there.  There's no other

24    explanation for that search that makes any sense.

25         Now at the beginning of this trial Judge Young

1   told you, before you heard the evidence, that the
2   defendant was an innocent man, that was then and this is
3   now.  Now you have heard the evidence.  That evidence
4   speaks for itself, speaks loud and clear, and common
5   sense tells you everything you need to know to interpret
6   that evidence.  These files are child pornography, they
7   were on the defendant's computer on August 12th of 2015,
8   and he knew they were there.  There's really only one
9   verdict that fits this evidence and any, any reasonable
10  inferences that you can draw from it, and that is that
11  the defendant is guilty.
12              THE COURT:  Mr. Carney.
13              MR. CARNEY:  Thank you, your Honor.
14
15  CLOSING ARGUMENT BY MR. CARNEY:
16         Your Honor, members of the jury, I want to start
17  my closing the way I started my opening and tell you how
18  appreciative we are that you gave up time, in the
19  summer, for serving as a juror, especially a juror on
20  this type of a case, but I believe that, um, we made it
21  easier for you, or the defendant made it easier for you,
22  he states that there is no question that these videos
23  and photos are child pornography, it's disgusting,
24  horrific, and pure evil, there's no question about that,
25  and that's why the defendant agrees that all of the 12

```
 1    videos and one photograph are child pornography.  You
 2    can accept that as a judicial admission, as Judge Young
 3    indicated.  None of you even have to look at the child
 4    pornography because we concede it is child pornography.
 5          Another issue we conceded is that these images
 6    were on Alex's computer.  So that's another thing you
 7    don't have to take much time to think about, because
 8    they were on his computer.
 9          The only issue for you to decide is whether Alex
10    knowingly possessed those 12 videos and one photograph,
11    that's the only issue in this trial, did he knowingly
12    possess it?
13          The definition of "knowingly" that's going to be
14    given to you by the judge is contained on this poster
15    (Puts up on easel.)  Can everybody see it?  The judge
16    will instruct you that "knowingly" means the act was
17    done voluntarily and intentionally and not because of
18    mistake or accident.  This is what the Commonwealth -- I
19    mean the prosecution has to prove to you beyond a
20    reasonable doubt, that Alex knowingly downloaded that
21    child pornography onto his computer.  If he didn't
22    intentionally and voluntarily download it to his
23    computer and instead put it on there because of accident
24    or mistake and the government doesn't prove that it
25    wasn't there because of accident or mistake, then the
```

1    defendant is entitled to be found not guilty.

2         Now I suggest to you that the strongest indication

3    that Alex knew that these 12 photos -- the 12 videos and

4    the photo were on his laptop would be if he opened it.

5    It's common sense that the reason people download child

6    pornography is they want to view it, they want to look

7    at the pictures or look at the videos, that's why they

8    download it, but in this case there is absolutely no

9    evidence that Alex ever opened those 12 videos or looked

10   at that photograph.  That is the clearest indication

11   that Alex did not know they were there.  And despite all

12   the other evidence that the government wants you to

13   consider, the most important is the judge's instruction

14   that, in order to be found guilty, Alex had to knowingly

15   possess that child pornography, and it means that the

16   child pornography, obtaining the child pornography was

17   done voluntarily and intentionally and not because of

18   mistake or accident.  And if the government hasn't

19   proven to you, beyond a reasonable doubt, that this

20   pornography did not end up on his computer by mistake or

21   accident, then the defendant's entitled to be found not

22   guilty.

23        Now there's no proof in the evidence that these

24   files were ever opened by Alex, there's nothing on his

25   computer that shows he opened those files.  There's no

1    proof that, prior to January 31, 2015, that those files

2    were ever opened.

3        Now you heard a lot about opening a file and

4    accessing a file, but we're talking here about whether

5    Alex opened those videos, because if he opened those

6    videos, he had to know they were there.  If he never

7    opened those videos, doesn't that support that he did

8    not know they were on his computer?

9        Now on January 31st of 2015 you heard how

10   Microsoft indexed every file on that folder and that was

11   the last time that anything on that computer was opened,

12   which means there is no evidence, from January 31st of

13   2015 until the date of the search in August of 2015,

14   that Alex ever opened anything on that computer.  He was

15   using his new computer.

16       What else shows that the government hasn't proven

17   that Alex opened these files?  We have heard about files

18   being linked, and what that is, as both experts

19   confirmed, is that when someone opens a video file, it

20   automatically creates a link so that if the person wants

21   to go back and view that file again, he essentially is

22   clicking on the link, which takes him, the person

23   immediately to the video.  That's undisputed.  It says

24   "lnk" at the end of a video's reference title if it has

25   been opened by a viewer.  There is no "lnk" on any of

1   the 12 videos, nor on the photograph, which means those

2   12 videos and that photograph were never ever opened on

3   Alex's computer, because if they had been, "lnk" would

4   have been found at the end of their titles and not a

5   single one had "lnk."

6        You'll find, in looking at Alex's computer, he's

7   got an awful lot of video files in there that do have

8   "lnk" after them, indicating he did look at those, but

9   not a single one of these 12 videos has any "lnk,"

10  meaning conclusive evidence it was never opened.

11       Now the -- Alex explained to you how the

12  pornography could have got on his old computer.  He

13  would do a disk sweep or drive sweep and bring

14  everything in someone's hard drive onto his own

15  computer.  The common sense reason why he would do this

16  is because he could then, at his leisure, pick up all

17  the Grateful Dead song files, at his leisure he could

18  look at all the Bitcoin files on there, at his leisure

19  he could look at all the movie files put on there, and

20  he could decide which ones he wanted to keep, and those

21  would remain on his hard drive.  In fact a lot of the

22  time, if not most of the time, everything was left on

23  the hard drive.  Rather than taking the time to go

24  through it and delete it, he had so much storage space

25  on his computer, he never had to get rid of it.  He

1    indicated he was also a little lazy in not wanting to

2    delete it, especially after he had just spent several

3    hours looking for what he wanted, Grateful Dead tapes,

4    movies, and Bitcoin stuff.  After he had pulled that off

5    their hard drive, he had no other reason to be on that

6    hard drive whatsoever.

7        Now when you input a stranger's hard drive, you

8    probably get things you're not interested in like an

9    article about the upcoming spring fashion show or you

10   get the 10 best tuna fishing boats in New Orleans.  He

11   didn't care about those things, so he'd never seen those

12   things, but those things would remain on his computer.

13   If he were asked, "Do you have any information about a

14   spring fashion show going on?"  "No."  "Do you know what

15   the best tuna boats are in New Orleans?"  "No."  "Well

16   may I look on your computer, sir?"  "Sure, I don't have

17   anything like that."  Well what would pop up?  The

18   fashion shows and the tuna fishing boats, which he

19   didn't know because he didn't look at the entirety of

20   the download.

21       How else do you know that Alex did not knowingly

22   download the child pornography to that electronic

23   device?  As you recall, the FBI seized every electronic

24   device that Alex had, including a laptop, two tablets,

25   two MP-3 players, two USB drives, two external hard

1    drives, and his smart phone.  Not a single one of these
2    devices had any pornography on it, any whatsoever.  They
3    did a very thorough search of his apartment to see if
4    there was any printed child pornography.  They didn't
5    find a single thing indicating he had child pornography
6    on his hard drive.
7         Now the prosecutor makes a lot about that Alex is
8    some kind of computer genius.  Well he might be in the
9    areas where he works in business applications of
10   computers, but it doesn't take a genius to go on the
11   file-sharing program -- heck, the first one he said he
12   was on was Napster.  Napster was a program where you
13   could get files transferred from that program to your
14   computer.  Well peer-to-peer sharing was another way
15   files could be brought over to your computer and Alex
16   would sweep someone's disk or someone's hard drive and
17   bring it into his computer.  That took no genius at all.
18        So although he might have expertise in some ways,
19   you don't need expertise to use file-sharing software,
20   you can just look on Wikipedia or Google for files
21   that -- peer-to-peer file-sharing, it will come up and
22   it will tell you how to get on and how to look at other
23   people's files that they want to share with you.
24   They're hoping you will share with them, but they are
25   willing to share some files or all the files, and the

1    downloading is easy.  A 12-year-old could do a peer-to-

2    peer sharing, that's how easy it is.  It's like

3    downloading something from Itunes.

4         And finally, there's no admission by Alex, no

5    statement or confession he made.  In fact when the

6    agents were there and sitting with him and explaining

7    what they were going to do, they said, "All right, sir,

8    we have a search warrant here, we're going to search to

9    see if you have any child pornography."  His response

10   was, "Wholly shit, you're not going to find any porn."

11   And in fact, what he was probably thinking was whether

12   there was any legal pornography or adult pornography on

13   there.  If someone has child pornography on his

14   computer, don't you think there would be evidence of

15   adult pornography also?  But his response, "Wholly shit,

16   you're not going to find any porn," tells you what he

17   believed.

18        Ladies and gentlemen, the issue you have to decide

19   is whether Alex knowingly possessed those images and I

20   suggest the clearest indication that he had those videos

21   would have been his opening the videos, and those videos

22   were never opened.  That is enough to create a

23   reasonable doubt in this case as to whether Alex

24   knowingly possessed those videos.  He never viewed them

25   once.

```
1            Thank you very much.
2                 THE COURT:  A brief rebuttal, any?
3                 MS. PARUTI:  Yes, your Honor.
4                 THE COURT:  You may.
5                 MR. CARNEY:  Your Honor, I meant to do one
6      more thing.  Would you permit me to just do another 2
7      minutes of my closing?
8                 THE COURT:  You may.
9                 MR. CARNEY:  Thank you.  I'm sorry.
10                (Puts up easel.)
11                MR. CARNEY:  When I was a prosecutor my boss
12     use to say "corroboration.  Corroboration.
13     Corroboration."  Now let's look and see this and
14     determine whether this corroboration is there.
15          "Evidence that Alex opened the 13 files prior to
16     January 31, 2015."  If there were evidence that he
17     opened the 13 files, you would have seen it, it would
18     have been thrust upon you as the clearest evidence that
19     Alex knowingly possessed them.  But the fact that there
20     is no evidence that he opened the 13 files means you put
21     an "X" in there.
22          (Writes.)
23          "Is there evidence that Alex opened the 13 files
24     after January 31, '15?"  Had he accessed them after that
25     date and opened them, it would have been on his -- it
```

1    would have been evident on his hard drive, in fact it

2    would have links now assigned to the 13 files.  That's

3    evidence that the government could have presented to

4    corroborate it.

5         If there were a link attachment to the 13 files on

6    the laptop, that would have corroborated it greatly

7    because if there were a link attachment, Alex would have

8    had to have opened those files, it would have been

9    conclusive evidence that he opened those files.  But

10   there's no evidence of a link on there.

11        (Writes.)

12        If child pornography were found on the other 10

13   devices or even 1 of the other devices, that would be

14   evidence that Alex knowingly downloaded this stuff.

15        (Writes.)

16        "If there were printed images of child pornography

17   found in the apartment."  If security measures were

18   installed in the 13 files to prevent opening by someone,

19   such as we heard, um, password protect, or, um,

20   cryptology, encrypting the folders.  Alex never took

21   those measures on his own computers.  As he said, he had

22   a password that a child could figure out in 10 minutes.

23             THE COURT:  You said 2 minutes, Mr. Carney.

24             MR. CARNEY:  All right, your Honor, I'm on the

25   last 10 seconds.

1           Or any admission that Alex knew about the files.

2           (Writes.)

3           If all of these boxes were checked "Yes," then

4    that would be proof beyond a reasonable doubt that Alex

5    knowingly possessed these items on his computer.  That

6    would have been proof beyond a reasonable doubt.  What

7    does it tell you that the answers are all "No."  Thank

8    you very much.

9           THE COURT:  Ms. Paruti, a brief rebuttal.

10

11   REBUTTAL ARGUMENT BY MS. PARUTI:

12          First of all, Mr. Carney's speculation about what

13   this defendant may or may not have thought when the

14   police told him, "Oh, it's not about the internet, it's

15   actually about child pornography," is not only

16   irrelevant to your determination here, but it would be

17   completely improper for you to engage in any type of

18   speculation, especially along the lines that he just

19   asked you to do.  You must base your verdict on the

20   facts that are in evidence.  Obviously if the defendant

21   admitted on the scene that he had child pornography, we

22   would be situated differently here.  That's not where we

23   are.  We have his computer, we have the files that were

24   on there, and the other evidence you heard tells you

25   that he knew they were there.

1          To be clear about the facts that you heard from

2     the witness stand, from government witnesses and defense

3     witnesses alike, you know that link files are created

4     when something's opened.  You also know that that

5     Windows registry that you'll look at in Exhibit 26,

6     logged the most recently-opened files.  It's a finite

7     list.  You know those files were on Alex Levin's

8     computer starting in 2011.  Lazy is not a defense.  And

9     the government's burden is not to show you, to convince

10    you, to prove beyond a reasonable doubt that he

11    downloaded them knowingly, the government's burden,

12    which the judge will instruct you on, not Mr. Carney, is

13    to show you that the defendant knowingly possessed them,

14    that is he had control of them, and that possession was

15    knowing, it was not a mistake, it was not accidental, it

16    was not unintentional.

17         The defendant searched for things that he wanted

18    to find.  No one, not this defendant, not anyone, puts

19    in the effort to look through what he had, his

20    possessions that belonged to him, to find something he

21    doesn't want to find.  His searches tell you more than

22    when he accessed files or to what happened to files

23    after he opened them, and that's all you really need

24    here.  There's absolutely no reason that makes any sense

25    or holds any credibility for why this defendant, Alex

1    Levin, searched his computer for preteen hard core other

2    than to find those files that were highlighted and on

3    the screen before you.  That's the end.

4            (Is seated.)

5            THE COURT:  All right, ladies and gentlemen,

6    why don't you just stand up.

7            (Jury stands.)

8            THE COURT:  Everyone else can sit down, but

9    the jury and I will remain standing.

10

11   JUDGE'S CHARGE TO JURY:

12        It's the tradition in this session of the court

13   and in the court where I started serving as a judge that

14   at the beginning of the charge, in a criminal case, all

15   the jurors and the judge stand and face each other, and

16   that's because we all stand up as you go in and out out

17   of respect to the central role you play in our justice

18   system.  But we stand together now out of an

19   acknowledgement of the fact that we live under a

20   government of the Constitution and laws, and the fair

21   and impartial application of those laws is at the very

22   heart and core of our civilization.  Under the

23   Constitution it is guaranteed to the government and to

24   Mr. Levin that this case be judged by judges, and that

25   includes you, who are just as fair and impartial as the

```
 1    lot of humanity will admit.  And so it's right that we
 2    stand and face each other and acknowledge that
 3    responsibility.  A famous judge I was privileged to know
 4    said it this way, "There has to be a safe place and we
 5    have to be it," and that's the truth.  Please be seated.
 6         Now this is the judge's charge, this is like a law
 7    school class, you must take the law the way I explain it
 8    to you, you cannot add to it, you cannot subtract from
 9    it.  Let's start with the two very basic principles I
10    started at the very beginning of the case.  The burden
11    of proof here rests upon the government and the burden
12    of proof, in a case like this, is proof beyond a
13    reasonable doubt.  It is appropriate to use your common
14    sense, I'm going to refer to common sense, but that's
15    not the burden of proof, the burden of proof is beyond a
16    reasonable doubt of each essential element of the case.
17         Mr. Levin need do nothing, he need explain
18    nothing, he did not have to take the stand.  Having
19    taken the stand, having presented evidence, you judge
20    that evidence just like you judge any other witness or
21    any other evidence, you can believe it, you can
22    disbelieve it, you can disregard it.  It's just that
23    he's never burdened with coming forward with any
24    evidence.
25         Let's start now with your function.  Now that
```

```
 1    you've got those principles firmly in mind, your
 2    function is to decide this case fairly and impartially
 3    on the evidence as you have heard it and seen it in
 4    accordance with the law.  All the jurors -- at the end
 5    of my charge we're going to pick two of your numbers,
 6    they're alternates, they will go into my little office
 7    and they won't get to deliberate.  Don't, for a moment,
 8    think that you don't play a very important role if
 9    you're an alternate, it shows how seriously we take this
10    whole process because while it's rare, and God forbid
11    something could happen, there could be a real emergency
12    at home with respect to one of the deliberating jurors,
13    or one might take sick or the like, and if that were to
14    happen, we'd send in an alternate.  And if that were to
15    happen -- rare, but I've seen it on more than one
16    occasion, I'll tell everyone, "Start all over."  It's a
17    different jury.  It's a different 12.  It's not 11 who
18    have been talking about things and one additional who's
19    to be brought up to date, that's not the way it works.
20    And that emphasizes to each one of you that all of you
21    together are asked -- not commanded, but you're asked
22    now, can 12 of you agree upon an unanimous verdict here,
23    because it must be unanimous, unanimous if you were to
24    find Mr. Levin guilty, unanimous if you were to find him
25    not guilty.
```

1          Now my function is fairly and impartially and
2     accurately to teach you the law.  I must go over every
3     aspect of the law, though as the parties and the lawyers
4     have stepped right up here, as they've candidly
5     explained, not everything is disputed here, and I'm
6     entitled to take the lawyers at their word, and I do,
7     and I will point out, "Well this isn't disputed," "That
8     isn't disputed," "and some things are disputed."  But
9     the government -- I have to accurately explain each
10    aspect of the law.  It's like I build for you a mental
11    framework and then it's up to you to apply that
12    framework to the evidence in this case.  So don't think
13    that because I explain everything, I think anything's
14    been proved, I have nothing to say about it.

15         Now in this case I keep talking about proof, what
16    do I mean?  In this case there are four separate types
17    of proof that you're going to have before you.  Well you
18    have -- excuse me.  You have here a stipulation.  Now
19    that's something that the parties agree to, and we read
20    it out.  There's no dispute about that, it's Exhibit 16.
21    And the stipulation is that the -- and it's admitted
22    that the 13 video files, and they're on Exhibit 17, that
23    they're child pornography, and I'm going to come to
24    that, but it's admitted.  A stipulation is something
25    they agree to, that they passed in interstate commerce,

1   and that's what gives the courts of the United States,

2   gives Congress the right to declare the activity a

3   crime.  So that's one source.

4        Another source of evidence here, though it came

5   out of Mr. Carney's mouth, is what we call a "judicial

6   admission."  He said at the beginning of the case and he

7   said again in his closing on Mr. Levin's behalf, "These

8   13 files, they're child pornography," and you're

9   entitled to take him at his word and go no further.

10  Though you're permitted to go further.  You'll have the

11  actual evidence before you, you'll be permitted to view

12  it, draw your own conclusions and the like, but you can

13  take him at his word.  We call it a "judicial

14  admission."  There's no dispute about that.

15       Now beyond that we have, um, the testimony of

16  various witnesses.  Well certain things in that

17  testimony, that is disputed.  So what can you tell or

18  how can you deal with the testimony of the various

19  witnesses?  I charge you you can use everything you know

20  about these witnesses, as these witnesses testified from

21  the witness stand, in order to decide whether to believe

22  the witness.  Your powers with respect to whether to

23  believe a witness are unlimited.

24       If I've let a witness testify to something, you

25  can believe everything that witness said.  But equally

1    you can disbelieve everything that witness said, just

2    disbelieve it all as though that witness never took the

3    stand.  And between those two extremes, you can believe

4    some things a witness said and disbelieve other things a

5    witness said.  And you're not prevented from reaching a

6    verdict here because there's one version of an event in

7    the evidence and there's another version of an event and

8    there's evidence, you as jurors can resolve those

9    disputes, and that in essence -- that is in essence

10   central to your function, you can decide where the truth

11   lies.

12        How do you do it?  You're not prevented from

13   reaching a verdict.  I said you can use everything you

14   know about the witnesses.  So think, what is the ability

15   of the witness to testify about those things about which

16   the witness testified?  What's the ability of the

17   witness to know those things, to comprehend those

18   things, accurately to convey that data to you?  Does the

19   witness stand to gain or lose anything dependent --

20   depending upon the outcome of this case?  Is the witness

21   a party?  Is the witness employed by one side or

22   another, and did that color the witness's testimony?  I

23   do not suggest that it does.  All I say is you may

24   consider it.  Is the witness's testimony backed up,

25   "corroborated," we say, by other evidence in the case,

1   the written and visual evidence, the things we've called

2   exhibits, the testimony of other witnesses, or does that

3   other testimony undercut, take away, make less

4   believable what the witness testified to?  So you have

5   the testimonial evidence.

6        Then you have the exhibits, those things to which

7   we gave numbers.  You will have access to all of them in

8   the courtroom.  Paper exhibits we will send back to you,

9   we have them in electronic form.  The disk of what's

10  admitted to be child pornography, you can view it, it's

11  all there before you.  And with respect to that

12  evidence, you want to -- if you're examining it, you

13  look at it to see, one, is it authentic, and if you

14  think it's authentic, then what does it tell you about

15  the case?  How does it fit?  Does it back up the

16  testimony of witnesses?  Does it take away from their

17  testimony?  Is it logical?  Does it make sense?  And

18  this is true of the testimony of witnesses, does it have

19  the ring of truth?

20       A couple of these witnesses, one for the

21  government and one called on Mr. Levin's behalf, by

22  background, training, and experience, I gave them the

23  right to express certain opinions to, in essence,

24  opinions about how computers worked, and if you did a

25  certain operation on a computer, what would happen,

1    things like that, and that's appropriate under our rules

2    of evidence.

3           Now if those opinions are based on facts that you

4    believe, and I've let you hear the opinions, then you

5    may, but you're not required to, accept those opinions.

6    But just because I've let an opinion witness testify

7    before you, whether for the government or whether for

8    Mr. Levin, doesn't mean you have to believe an opinion

9    witness, they're like any other witness, you can believe

10   or disbelieve them or you can believe parts of what they

11   said or disbelieve other parts.

12          Now in addition to the testimony and the written

13   evidence, from all that evidence, from the stipulation,

14   from the judicial admission, from the testimony of the

15   witnesses and the exhibits, you can draw what are known

16   as "reasonable inferences," logical deductions, common

17   sense.  You're entitled to use your common sense.  You

18   don't check your common sense at the door to the jury

19   room.  Just remember, that's not the standard of proof,

20   the standard of proof is proof beyond a reasonable

21   doubt, and that rests on the government, and it never

22   shifts.

23          Now what do I mean by "drawing reasonable

24   inferences"?  I'm going to give you an example, it has

25   nothing to do with the case, and it should illustrate to

1    you what you can do, but what you're forbidden from

2    doing -- because you can't guess, you can't speculate,

3    you can't be in there saying among yourselves, "Well

4    maybe this," "It could have been that," or "Perhaps this

5    happened," you're not to do that.  Here's an example of

6    a reasonable inference, a simple one.

7         A witness testifies she's walking along beside a

8    field of barley.  Barley is what they make scotch from,

9    there it is, beautiful standing up gray tassels on the

10   bottom of it.  And she looks out over the field of

11   barley and she sees that the barley is lying down in an

12   irregular course through the field.  And let's say you

13   believe that testimony.  From that testimony standing

14   alone you can conclude that the, um -- that something

15   went through there.  If it had been a savage rainstorm

16   it would have knocked all of the barley down.

17        So if you believe that testimony -- and she didn't

18   say she saw anything, but you can believe something went

19   through that field, but without more evidence you don't

20   know what.  Was it an animal?  A human?  Somebody on a

21   dirt bike?  An off-road vehicle?  You don't know.  You

22   cannot guess.  You're not in there talking about

23   "maybe," "perhaps," "possibly," or even "probably."  But

24   you may draw reasonable inferences, you may take into

25   account all the circumstantial evidence.  A verdict can

be based entirely on circumstantial evidence or on any

combination of circumstantial or direct evidence,

evidence that a person said "I did this" or "I saw

that."  But no guesswork.

Now let me say just a few words -- and we won't

take much time, but I do want to say a couple of words

about things that are not evidence, and while I'm doing

that Ms. Smith will -- oh, excuse me -- forgive me,

Ms. Gaudet.  Ms. Gaudet will pass out to you the verdict

slips and you'll see that they're very straightforward.

First of all, I want to compliment all the

attorneys who have spoken here, Ms. Paruti, Mr. Carney,

Mr. Gaudet.  They've done the attorney's job, they have

been proper officers of the court, they have tried this

case well, they have discharged their function to their

respective clients.  I don't say that in every case, it

applies in this case, and I mean it most sincerely.  Now

disregard it.

You see you're not judging -- it's all true, but

disregard it.  You're not judging this case in any way,

shape, or form based upon your assessment of the

performance of the attorneys.  If the attorneys helped

you better to understand the case, its strengths, its

weaknesses, they've done what they are expected to do.

But you're not judging it based upon the attorney's

```
 1   performance.
 2        Equally important, and it is important, if during
 3   the course of the trial an attorney did something that
 4   sort of grated on you, you didn't like that, don't hold
 5   it against that attorney's client, that's not fair.  I'm
 6   telling you these attorneys are doing the very best that
 7   attorneys can do with the evidence that's here before
 8   you.
 9        Equally important.  Don't you think I think
10   anything at all about this case and I most earnestly
11   tell you I do not, I have no view about this case.  As I
12   have instructed you, so too I obey my own instructions.
13   I talk about the law with my law clerks, but I do not
14   talk about the case with either the law clerks or
15   Ms. Gaudet, or Mr. Romanow.  The case is for you to
16   decide.  I'm not here to give you any clue how the case
17   ought to come out, and I have none.
18        I do have this bias and I acknowledge it.  I
19   believe passionately in the jury system.  I believe that
20   you will do justice in this case.  That's what I
21   believe.
22        Now let's take a look at this verdict slip, and
23   you only need one verdict slip to be returned and that's
24   the one from the forelady, but so you can all follow
25   along, you should have your verdict slip.  And you see
```

```
1    I've called out in the paragraph there the elements of
2    the charge, it's a charge of knowing possession of child
3    pornography affecting interstate commerce.  Now let me
4    go through those four elements, but I'm going to go
5    through them backwards, because I think you can
6    understand it the best.
7         So did -- it's admitted that the 13 videos on
8    Exhibit 17 are child pornography, so we'll assume that
9    for a moment, but did they pass in interstate commerce?
10   It's agreed, that's Exhibit 16, that's the stipulation.
11   Both sides agree.  There's no dispute about that.  But I
12   do tell you that so central is your role that you have
13   the power to disregard that stipulation.  But I'm also
14   telling you everyone agrees on it, so you may take that
15   as proven.
16        Now let's back up.  Are these 13 videos in Exhibit
17   17 child pornography?  Mr. Carney in his opening and in
18   his closing he agrees that they are.  You may take him
19   at his word.  Even so, I should give you the legal
20   definition of "child pornography."  You will have the
21   videos before you, the burden is on the government, you
22   are free to view them or so much of them as you think is
23   appropriate, even though he's agreed they're child
24   pornography.  This is what child pornography is under
25   the law.
```

1          Any photograph, video, picture, or computer image

2     of sexually-explicit conduct that was produced by using

3     an actual person under the age of 18 engaged in

4     sexually-explicit conduct.  As this case has been

5     charged, at least one of the images on one of the videos

6     must show a prepubescent child, that is a child who has

7     -- a minor who has not obtained the age of puberty, a

8     child under the age of 12 generally.  "Sexually-explicit

9     conduct" includes any one of the following categories of

10    conduct, whether actual or simulated:  Sexual

11    intercourse, including genital-genital, oral-genital,

12    anal-genital, or oral-anal, whether between persons of

13    the same or opposite sex.  (2) masturbation.  (3)

14    sadistic or masochistic abuse.  Or (4) lascivious

15    exhibition of the genital or pubic area of any person.

16    Here it's admitted these videos constitute child

17    pornography, so child pornography, Exhibit 17, which

18    moved in interstate commerce, Exhibit 16.  Was it

19    possessed?  Well here's what the law says about

20    "possession."  Was it possessed by Mr. Levin, that's

21    what we're concerned with.

22          "Possess" means to exercise authority, dominion,

23    or control over something.  Possession is of two types,

24    we call it "actual" or "constructive possession."

25    Here's my old judge notebook, I've carried it around for

```
1    years.  I possess it.  I mean I literally possess it,

2    I've got it, I carry it around, it comes out on the

3    bench with me.  Back in chambers there, I have a

4    briefcase, also old and battered, it's mine.  Nobody

5    goes into my briefcase, it's my briefcase.  When I go

6    back there, I can get it.  I have possession over it,

7    though I'm here and it's there.  The car that I own, I

8    get to park beneath the courthouse, it's down there, but

9    it's my car, I can go down there and get it.  I possess

10   it.

11        Here in this case, if you believe that the

12   computer or computers and the electronic devices were

13   Mr. Levin's, if you believe that Mr. Levin is the one

14   who used them, had physical access to them, not in any

15   technical term, that he was the one who turned them on

16   and turned them off and performed operations on the

17   computer, you may say he "possessed" the computers, and

18   if you believe the evidence, that Exhibit 17 is 13

19   videos of child pornography, then he possessed child --

20   you may find -- and I'm not telling you you must find,

21   but you may or you may not find that if they were there

22   on his computer, he possessed child pornography.

23        Now to "knowingly."  The law, as has been properly

24   set forth to you, requires the government to prove that

25   "knowingly" means that the possession here on the
```

1   computer -- not any download, but the possession was

2   voluntary and intentional, not because of mistake or

3   accident.  Now that's disputed.  The burden of proving

4   that it was knowing possession, like all the other

5   elements, that's on the government, proof beyond a

6   reasonable doubt.

7       Now let me say a few words about how you

8   deliberate together.  If you find all four elements,

9   knowing, possession, child pornography, affecting

10  interstate commerce, you may find Mr. Levin guilty of

11  this charge.  If the government fails to prove any one

12  of those elements beyond a reasonable doubt, you must

13  find him not guilty.

14      When you come to deliberate you all deliberate

15  together.  Now is the time for you to talk about the

16  case, this case.  And deliberations are the

17  deliberations of all 12 of you acting together and not

18  10 of you talking about the case and 2 of you wondering

19  why that person over in Vertex has the big Kermit the

20  Frog doll over there, or stuffy.  If he ever takes that

21  out of the window, I will lose part of my charge -- or

22  she.  I don't know who has it.  But it's over there.

23  Don't look at that, that's why you have the big

24  conference table.  Deliberate together.

25      It's probably not a good idea, not a good idea to

1    go in there and take a straw vote right at the outset

2    because you may think that if you express yourself that

3    way right at the outset, under your oath you've got to

4    stick with that view.  Jury deliberations are just that,

5    they're deliberations, they're a discussion to see

6    whether 12 independent people all under the same oath

7    who have seen and heard the same evidence and are

8    charged with the same explanation of the law can come to

9    a unanimous verdict.

10         So if your initial reaction, when you go in there,

11   is changed by the views of your fellow jurors, genuinely

12   changed, that's fine, but there's no going along just to

13   bring the afternoon to an end, you've violated your oath

14   if you've done that.  You can't be 10 to 2 or 11 to 1 or

15   9 to 3, and "Oh, well, let's go home," you've failed if

16   that happens.  It must be unanimous, unanimous if he's

17   to be found guilty, unanimous if it's not guilty.

18         Focus on the evidence.  You'll have your notebooks

19   with you, take them with you now.  If you've taken notes

20   -- and I say this respectfully, it doesn't make you a

21   better juror, don't pass the notes around, but feel free

22   to consult your notes.  But don't pass them to other

23   jurors, they're not evidence.

24         Here's what's going to happen, at least

25   mechanically it's going to happen.  We've ordered lunch

1   for you right for 12:00.  I have to leave the building

2   as soon as I'm done with this, I'm not going far and

3   I'll be back within the hour.  But understand that for

4   an hour you can be deliberating, but I'm out of here for

5   an hour at a law event.  But I'll be back at 1:00, and

6   this will prove to you I work all afternoon, so I'll be

7   right here.

8            If you have any questions, write them out, I'll

9   bring you back in here -- any questions about the law, I

10  have nothing to say about the evidence, but about the

11  law, we'll bring you back in here, I will explain it to

12  you.  We ask you to do justice, we cannot expect you to

13  do justice unless you truly understand what the law

14  requires.

15           When you have reached a verdict, if you don't

16  reach it today, we'll let you go at 5:00, return here at

17  9:00 and continue your deliberations.  When you reach a

18  verdict, tell the Court Security Officer you have a

19  verdict -- don't give him the verdict slip, but tell

20  him.  You make the appropriate check mark, the forelady

21  signs it and dates it.  I stop what I'm doing out here

22  and, um, we clear the tables and everyone gets set and

23  in you come.

24           And if you're back with your verdict, Ms. Gaudet

25  will say to you "Ladies and gentlemen, have you agreed

1    upon an unanimous verdict?"  If you've got the verdict,

2    I imagine you'll say "Yes."  She'll say "Pass the

3    verdict slip," and everyone's watching, and it's passed

4    up to me.  And I look at it.  Now I look at it only to

5    see that it's logical.  And this is a very

6    straightforward verdict, it can either be not guilty or

7    it can be guilty, but if it's blank, I wouldn't know

8    what to do.  If you've checked both alternatives, I

9    don't know what to do.  But so long as one is checked

10   and it's signed and dated, I say "The verdict is in

11   order, it may be recorded."  I give it to Ms. Gaudet.

12   She'll ask you to stand up.  If, when you stand up

13   there, each one of you is satisfied with the

14   consciousness of your verdict faithfully recorded, then

15   you will have done what's required of you as jurors.

16   The word "verdict" comes from two Latin words, they mean

17   "to speak the truth," and that's what we ask of you now,

18   to speak the truth.

19        Now I may have left something out, I may have

20   misstated something, the lawyers get a chance to correct

21   me now before we send you out.

22        Counsel.

23

24        AT THE SIDEBAR

25        THE COURT:  Satisfied, Ms. Paruti?

 1              MS. PARUTI:  Yes, the government's content.

 2              THE COURT:  Satisfied?

 3              MR. CARNEY:  I renew my motion for a directed

 4    verdict.

 5              THE COURT:  Noted and denied, and your rights

 6    are saved.

 7              MR. CARNEY:  And also the jury instruction.

 8              THE COURT:  And I expressly refused, but again

 9    your rights are saved as to that.

10         And thank you, Mr. Gaudet, for bringing that up.

11    I'm going to let out the alternates.  I put the

12    alternates in what we call a "robing room," which I

13    think is pompous, but I have to go in there to take the

14    robe off and leave.

15         No objection if I do that with the alternates

16    being there?

17              MS. PARUTI:  No objection.

18              MR. CARNEY:  No objection.

19              THE COURT:  All right.  Thank you.

20

21              (In open court.)

22              THE COURT:  I'm going to designate the two

23    alternates and the alternates can come down to these two

24    chairs here, and when we send the jury out, would you

25    simply turn to the right and go into my little office

1    next to the jury room.  Don't worry, we'll have lunch

2    brought in there and the like.  And that's where you can

3    wait while the jury deliberates.

4         The alternates in this case are Arianna Gynan and

5    Michael Hooley.  All right.

6              (Two people leave jury box.)

7              THE COURT:  The jury may retire and commence

8    their deliberations.  I'll remain on the bench.

9              THE CLERK:  All rise for the jury.

10             (Jury leaves, 12:00 p.m.)

11             THE COURT:  Please be seated.  Ms. Gaudet will

12   come out and go over the exhibits with you.  I will be

13   at the Boston Bar till 1:00, come straight back, so it's

14   a good time for you to have lunch.

15        And the compliment was sincerely meant, I do

16   appreciate how you have tried this case.

17        We'll stand in recess.

18             THE CLERK:  All rise.

19             (Recess, 12:00 p.m.)

20             (Jury enters, 3:40 p.m.)

21             THE COURT:  Let the record show that the 12

22   deliberating jurors and the two alternates are present

23   in the courtroom.  I've received two questions and I

24   will read them.

25        The first is "Can we receive the transcripts of

1    Agent Phelps about the word wheel query related to
2    explorer?"
3            Is that the first question, Madam Forelady?
4                 THE FOREPERSON:  Yes.
5                 THE COURT:  Is that the first question, ladies
6    and gentlemen of the jury?
7                 THE JURY:  (In unison.)  Yes.
8                 THE COURT:  I'll read the second question.
9        "Does the explorer of word wheel query include
10   searches of internet explorer or only computer?"  And
11   then there's a reference to Exhibit Number 26, the
12   Registry Report, 15 pages.
13           Is that the second question, Madam Forelady?
14                THE FOREPERSON:  Yes.
15                THE COURT:  Is that the second question,
16   ladies and gentlemen of the jury?
17                THE JURY:  (In unison.)  Yes.
18                THE COURT:  To those questions, I make these
19   answers.  That's the formal way of doing it.
20           Well the first question is -- the usual answer is
21   "No," but because we have Mr. Romanow and he is a superb
22   Court Reporter, the answer is "Yes, but not until
23   tomorrow," and here's why.  Because I can't just give
24   you part of a witness's testimony, I have to give you
25   all of Phelps's testimony so you can look at whatever

1    you want.  But I have to give you the complete direct

2    testimony and I have to give you the complete cross-

3    examination of Mr. Phelps because you're evaluating

4    credibility, not just answering questions.  So I will by

5    tomorrow.  And you've got to figure out how you want to

6    proceed.  You can proceed without it.  We're not going

7    to ask you any questions, I'm just going to send you

8    back.  You can send word out that you'd like to stop and

9    come back tomorrow.  That's entirely up to you.

10         The second question is a factual question that

11   perhaps getting the first one answered will answer the

12   second.  But I'm not permitted to speak to the second,

13   because that's for you, it's from the evidence.  You're

14   limited to the evidence and the reasonable inferences

15   you can draw from the evidence.

16         So those are my answers to the questions.  The

17   jury may retire and continue their deliberations.

18              THE CLERK:  All rise for the jury.

19              (Ends, 3:45 p.m.)

20              THE COURT:  Please be seated.  And you folks

21   may all be in recess.

22              (Recess, 3:50 p.m.)

23              (Jury enters, 4:00 p.m.)

24              THE COURT:  Let the record show that the 12

25   deliberating jurors and the two alternates are present

1    in the courtroom.  The jury has indicated a desire to

2    stop for the day and resume tomorrow, and that's what we

3    will do.  So I have some instructions for you.  And the

4    instructions are obvious.

5         You see now I can no longer say "keep your minds

6    suspended," and that means that you know things that

7    none of the rest of us know, nor should we know, you

8    know the tenor of your discussions over the afternoon in

9    the jury room.  Therefore it becomes doubly, triply

10   important that you not talk to anyone about this case or

11   take it into your head to start doing research on

12   computers or anything having to do with this case.  You

13   may only be influenced in this case, when you resume

14   deliberating tomorrow, by your view of the evidence and

15   the views of your fellow jurors and by nothing else

16   whatsoever.

17        So you're not to talk to the alternates about the

18   substance of the case or anything that went on in the

19   deliberating room, the alternates are not to talk to you

20   about those things.  I'm not saying you can't talk to

21   each other as you walk out, but not about those things.

22        So important is it that when you come in tomorrow

23   -- and the alternates may come in and the alternates may

24   be with you, don't talk at all about the case.  We'll

25   start promptly at 9:00, I'll bring you all in here,

1    you're on your oath as jurors, and now, in the middle of

2    deliberations I will ask you, I'll ask collectively but

3    it's on your oath as jurors, whether you have obeyed

4    these instructions.  They are so important, the

5    integrity of the entire proceeding depends on it.

6         So with the instructions, do not talk to anyone

7    about the substance of the case -- the deliberating

8    jurors don't continue talking among yourselves, don't

9    talk with the alternates, the alternates, don't talk

10   with the deliberating jurors about the substance of the

11   case.  You may stand in recess until 9:00 a.m. tomorrow

12   morning.

13        This frequently happens, that is the deliberations

14   take more than a day.  Go home, relax, come back

15   refreshed tomorrow, and give it a continuing look as I

16   know you are.

17        I will tell you, we've checked and, um, this

18   Mr. Phelps, he testified over parts of two days, so

19   we're searching out how much transcript there is.  This

20   is a real job for Mr. Romanow, I know he will do a

21   superb job, but he's got to check everything to make

22   sure it can be certified to you, and then we have to go

23   over it and take out -- if there were bench conferences

24   that you didn't hear, we naturally have to take them

25   out.  So there's a little process.  But we're doing it

1    as fast as we can.

2          You may stand in recess with those instructions

3    until 9:00 a.m. tomorrow morning.  The jury may recess.

4                THE CLERK:  All rise for the jury.

5                (Adjourned, 4:00 p.m.)

6

7                C E R T I F I C A T E

8

9          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

10   hereby certify that the forgoing transcript of the

11   record is a true and accurate transcription of my

12   stenographic notes, before Judge William G. Young, on

13   Wednesday, May 29, 2019, to the best of my skill and

14   ability.

15

16

17

     /s/ Richard H. Romanow 06-25-20
18   _____
     RICHARD H. ROMANOW  Date
19

20

21

22

23

24

25